277 So.2d 886

**Larry W. FULGHUM, alias Larry Wayne Fulghum**

v.

**The STATE of Alabama.**

**SC 315.**

Supreme Court of Alabama.

May 10, 1973.

Jacob A. Walker, Jr., Opelika, for appellant.

James J. Jenkins, Sp. Asst. Atty. Gen., Tuscaloosa, for the State.

FAULKNER, Justice.

This case presents the evil potentials of carrying a hand gun without any lawful authority to do so.

In the early morning of February 11, 1971, Charles Wyatt Harper, of Lee County, Alabama, was mortally wounded in his own home by Larry Wayne Fulghum, who shot him with a pistol.

From an examination of the record, we observe that Fulghum may not have been sober at the time of the shooting. By his own testimony, Fulghum had been drinking several hours before he knocked on the decedent's door at 4:30 A.M., and forced his entrance into decedent's house by pointing a gun at Mrs. Vivian Harper, the wife of decedent, when she answered his knock on the door. Fulghum came to see his wife, LeMirle, who happened to be spending the night in the Harper home. Mrs. Harper, a State witness, testified that at 4:30 A.M. her door bell rang. She got out of bed and looked out the window and saw Fulghum's car outside.

"Q. Now, what occurred after you saw the defendant's car outside your house?

"A. Well, I went to the door and I opened the door and he said "I want to see LeMirle." I said 'Larry, why don't you wait until in the morning.' I said 'they're all in the bed asleep. Why don't you wait until in the morning and come back or either call LeMirle.' He said, 'I want to see her now and I am going to see her now.' And I said, 'Larry, you're not coming in this house, just go on back.' And he said, 'I'm coming in.' And I said, 'Larry, I don't want to get my gun or anything.' I said 'You just go on back.' He said, 'I've got a gun.' And he drawed a gun on me and I stepped back and he came on in the house."

Mrs. Harper testified further that her daughter, Judy, who was now out of bed, told Fulghum to go back home and come back the next morning. He said he wanted to see her (LeMirle) tonight.

"THE COURT: See her tonight.

"A. And he went on through the house and he didn't know which bedroom she was in, and he looked in all the bedrooms. And when he saw the bedroom she was in and the two children were in the bed with her, he just jumped over on the bed and pulled her by the hair of the head and jerked her out of bed.

\* \* \* \* \* \*

"A. And he said, 'I am going to kill you.' And Judy and myself were trying to get him off of her. And he turned around and he said, 'Judy, leave me alone,' and he grabbed her by the throat and choked her.

\* \* \* \* \* \*

"THE COURT: \* \* \* Go ahead.

"A. And we got him off of Judy. Judy and myself and my little boy had got up then and of course, their two children were awake. And then he turned around and went back in the living room and was— had LeMirle down on the floor. And my husband came in the door. He said, 'What's the matter?' and he looked and saw Larry had Le-Mirle down in the floor. And he just ran into him and pushed him off of him [sic]. He said, 'Larry, get out of my house, just get on out of my house, you're not coming in here and doing like that.' And Larry said something, I don't know what he said and Buddy said, 'I'll get my gun and put you out, Larry.' He said, 'I've got a gun.'

\* \* \* \* \* \*

"A. Larry said, 'I've got a gun.) And he just reached in his pocket and just got it out and just shot him.

\* \* \* \* \* \*

"A. \* \* \* And I ran to the telephone and Larry told me that if I didn't get away from the telephone he'd blow my brains out. And I said, 'Larry, I've got to call an ambulance.' And I dialed the opera-tor and told her to get me the police and an ambulance. And I didn't see him anymore."

Fulghum was indicted for murder by the grand jury of Lee County. He was tried by a petit jury under pleas of not guilty and not guilty by reason of insanity. The jury found the defendant guilty of murder in the second degree. His punishment was fixed at 45 years in the State penitentiary. He appeals, alleging and arguing the following errors: (1) That the trial court erred in assessing defendant with the court costs; (2) that the trial court refused to charge the jury on manslaughter in the second degree; and (3) that the trial court erred in qualifying the jurors who had a fixed opinion against capital punishment

Fulghum testified in his own behalf. He testified that he and his wife were separated at the time of the shooting. Their problem appeared to be Fulghum's violent behavior toward her and the children. He said he had committed acts which he did not remember, including an occasion when he found his wife in an automobile with a girl friend. He jumped up and down on the hood of the car and smashed his fist through one of its windows. He said that he suffered from headaches. There was the State's inference of hangovers that caused these headaches, which defendant denied. On the night preceding the early morning shooting, he had gotten off work at 5:30 P.M., Georgia time and gone to his sister's house to get his children. His wife was there. They talked—but had no cross words—and he picked up his children and took them to his parents' house and stayed there until 8:00 P.M. He returned the children to his sister's house. His wife was still there and he asked her for the gun which she kept. His wife operated a beauty shop. She gave the gun to him. He said he was going to the Daytona races the next day. He left his sister's house at 9:00 P.M. and went to his home. Later in the evening he drove by his wife's apartment and found her gone. He wondered where she was. He went home again.

"Q. All right. So what did you do?

"A. I went home and sat there by myself for hours.

"Q. What were you doing while you were there by yourself?

"A. Drinking beer.

\* \* \* \* \* \*

"THE COURT: How much did you drink?

"THE WITNESS: I don't know, sir. I had quite a bit."

Fulghum testified that he had no recollection of going to the decedent's house. He was arrested at his father's house. He was in bed asleep when the law officer came to make the arrest.

We will consider the alleged errors of the trial court in the sequence in which they are argued by the defendant.

The minute entry in the record shows:

"\* \* \* And now on this 26th day of May, 1971, in open court, in the presence of the District Attorney, and defendant's attorneys, the defendant being asked by the Court if he had anything to say why the judgment and sentence of the law should not now be pronounced upon him, replied, 'he had not.' It is therefore considered and adjudged by the Court that the defendant is guilty of the offense of Murder in the Second Degree as embraced in the indictment, and that the State of Alabama for the use of Lee County, have and recover of the defendant the costs of this prosecution and that the defendant be imprisoned in the penitentiary of the State of Alabama for a term of forty-five (45) years."

When the defendant was found guilty by the jury, the court pronounced judgment and sentence as follows:

"THE COURT: According to the verdict of the jury, it is ordered and adjudged by the Court that you are guilty of murder in the second degree and as punishment, you are hereby sentenced to the penitentiary of the State of Alabama for a term of 45 years."

The defendant appealed to the Alabama Court of Criminal Appeals, and the cause was thereafter transferred to this Court by statutory authority.

 ·Defendant argues that he can not be sentenced to hard labor to pay the court costs in a felony conviction. Title 11, § 83, Code of Alabama, 1940, Recompiled 1958. In this respect the defendant is correct. In sentencing to the penitentiary, there is no sentence to pay court costs. Here, any reference to payment of the court costs is mere surplusage and is not to be considered a part of the sentence. Thomas v. State, 41 Ala.App. 674, 149 So. 2d 290 (1963); Weaver v. State, 1 Ala. App. 48, 55 So. 956 (1911). Such surplusage in the sentence does not, however, constitute reversible error.

 The next alleged error is the trial court's refusal in his oral charge, to charge the jury on manslaughter in the second degree. He stated, "But I will not charge you on manslaughter in the second degree." An exception thereto was duly reserved by the defendant; therefore, it was not necessary for the defendant to request a written charge on the same subject matter.

[4–10] A defendant who is accused of the greater offense is entitled to have the court charge on the lesser offenses included in the indictment, if there is any reasonable theory from the evidence which would support the position. Stovall v. State, 34 Ala.App. 610, 42 So.2d 636 (1949); Kelly v. State, 235 Ala. 5, 176 So. 807 (1937). Involuntary manslaughter, or manslaughter in the second degree, is where it plainly appears that neither death nor great bodily harm was intended, but death is accidentally caused by an unlawful act, or an act strictly lawful in itself, but done in an unlawful manner and without caution. Williams v. State, 251 Ala. 397, 39 So.2d 37 (1948). Where it is clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree, and where it clearly

**76**

shows from the evidence that the defendant was either guilty of murder or voluntary manslaughter or innocent, and, where there is no evidence tending to show that the killing was unintentional or accidental, a charge on manslaughter in the second degree is unnecessary and is not proper. Ware v. State, 147 Ala. 699, 41 So. 181 (1906); Ragsdale v. State, 134 Ala. 24, 32 So. 674 (1901); Pierson v. State, 99 Ala. 148, 13 So. 550 (1892). It was not error for the court to refuse to instruct the jury on manslaughter in the second degree. There is nothing in the record tending to show the killing was unintentional or accidental. The defendant did not exhibit any emotions of remorse and regret or offer any assistance to the injured Harper. On the contrary, he told Mrs. Harper that he would blow her brains out if she called an ambulance, and after shooting Mr. Harper the defendant went to his father's house and went to sleep. As a result of the intervention of the shooting, the record is bare as to what happened to LeMirle at that time. The law presumes that a man intends to do what he does. Allen v. State, 148 Ala. 588, 42 So. 1006 (1907). Furthermore, the law infers from the use of a deadly weapon an intent to kill or to do grievous bodily harm. A killing done with a deadly weapon is presumed to have been done maliciously. Cole v. State, 16 Ala.App. 55, 75 So. 261 (1917); Sylvester v. State, 72 Ala. 201 (1882).

The next error alleged by the defendant was that the court erred in qualifying the jurors who had a fixed opinion against capital punishment. The death sentence has been abolished in this State as a form of punishment. Hubbard v. State, Ala., 274 So.2d 298 (1973). This question is now moot.

We have examined the entire record for error and find none.

Modified and affirmed.

HEFLIN, C. J., and MERRILL, HARWOOD and MADDOX, JJ., concur.