DeCARLO, Judge.
James Chavers, Jr. was indicted for the offense of first degree murder. At the conclusion of the trial before a jury he was convicted of manslaughter in the first degree, and his punishment was fixed at five years’ imprisonment in the penitentiary. The appellant gave notice of appeal and asked for probation, which was denied. His motion for a new trial was denied, and the appellant is now before this court.
James Chavers, Jr. lived at 524 Booker Street in Roosevelt City, Jefferson County, Alabama, with his wife, Ethel Bell Chavers, Carlos Chavers, their ten-year-old son, and his step-daughter, Cora Dickerson.
On June 11, 1975, shortly after 6:30 P.M., the appellant returned home from his job at Malone Freight Lines, which he had held for some nineteen years. After eating supper with his family he went to the front porch and read the evening paper. Cora Dickerson testified that her mother also went to the porch, while she washed the dishes. Her stepfather stayed on the porch until about 8:00 P.M. when he went to the back yard and began cutting grass. She recalled going to bed about the same time. Cora testified that her stepfather returned to the house at 9:30 or 9:45 P.M. and that she and her brother were in their room at the time. She was reading and the lights were on in her room and in her mother’s room. Cora said that her stepfather went straight to the bedroom where her mother was and she heard him say, “Who knocked the knob off the lamp?” She testified that his voice was loud and that he asked her mother how she got the bruise on her arm. She said that her mother told him she did not know, and “that it was a possibility that she could have knocked up against something,” her stepfather said, “Some man had been in and put it on there,” to which her mother replied, “that wasn’t what happened, it was just probably something she had hit up on.”
*1098 Cora testified that she got out of the bed and was standing near the door of the bedroom. She stated she saw her stepfather come around to the side of the bed and lean over her mother with one arm raised in the air. Her mother said, “let her up.” With Cora at the door was Carlos, who at that moment ran back to their bedroom, returned with a vase and hit his father over the head. She testified that Carlos told her stepfather “not to hit his mother.” According to Cora, when the appellant was hit over the head he said, “don’t nobody hit me on my head and get away with it.”
Cora said her mother at that point had gotten up and her stepfather pulled a gun from his pocket and fired what Cora thought was two shots. At the time her stepfather pulled the gun, he was pointing it in the direction of her mother. She said that, after the shots were fired, her mother fell to the floor.
Cora recalled asking the appellant not to shoot her, but that he fired at her twice and she was hit in the upper hip. She stated that after the appellant shot her, he then turned and fired in the direction of the doorway where Carlos was standing.
According to Cora, the appellant passed her in the hall carrying the gun, at which time she got up and telephoned her aunt. Before she completed the call, the appellant returned to the house and went to the bedroom where her mother was. After calling her aunt, Cora returned to her parents’ room where she saw her mother lying on the floor with blood on her chest. She testified that the appellant told her mother “to get up, he was going to carry her to the hospital.” She said he then left, and the police and the ambulance came within a short time.
Carlos Chavers, the appellant’s son, testified that he went to bed about 8:00 P.M. in the bedroom he shared with his sister. He said his mother was in bed when his father came in the house about 10:00 P.M. Carlos then overheard his parents arguing. He stated they were arguing about “a doorknob” and he heard his father say “somebody beat her up.” Carlos testified that he went to his parents’ room and upon seeing his father “fixing to beat her up,” he picked up a vase and hit his father on the back of the head. He recalled that his father was bending over when he hit him and that he, Carlos, then ran from the room. Carlos stated he then heard gunshots but could not recall how many. When he returned to the room the gun was in his father’s hand and his mother was on the floor. According to Carlos, when his father pointed and fired the gun in his direction, he ran to a neighbor’s house.
William R. Stroud, a police officer with the city of Roosevelt, testified that on June 11, 1975, he went to the Chaverses’ residence in response to a radio dispatch: When he arrived he saw the appellant “coming out from under the carport.” According to Stroud the appellant said “that a gun had went off and shot his wife.” When Stroud entered the house Cora Dickerson was standing in the door and he found Mrs. Chavers on the floor in the bedroom. Stroud testified that Mrs. Chav-ers was taken to the hospital, where she died shortly thereafter. Later he was present when an autopsy was performed on her body.
On June 12, 1975, at approximately 9:45 A.M., Jay Glass, a deputy coroner for Jefferson County and an assistant pathologist at the Cooper Green Hospital in Birmingham, performed an autopsy on the body identified to him as that of Ethel Chavers. It was Glass’s opinion that death was caused by a gunshot wound to the abdomen with perforation of the liver and the inferi- or vena cava, resulting in bleeding into the abdominal cavity accompanied with shock.
James A. Howell was employed by the Jefferson County Sheriff’s Department as an evidence technician. On the morning of June 12, 1975, he went to the residence at 524 Booker Street in Roosevelt City. Howell identified photographs that he had taken of the Chaverses’ residence, one of them showing a closet door with a hole in it. He testified that inside the closet in a box he found a lead slug. Also, he identified a picture of a chair where he found a gun *1099 under the cushion. During the trial he identified the gun as a 6-shot revolver.
James Foy, the Chief of Police for Roosevelt City, stated that on June 11, 1975, he arrived at the Chaverses’ residence about 11:30 P.M., but the appellant was not present. He made photographs of the house’s interior and identified one photograph depicting a “bullet hole” in the floor of the front bedroom. Foy said he also observed a hole in the wall, and on the outside of the house opposite the hole he found a projectile underneath the shingle.
Following Chief Foy’s testimony the State rested and the defense made a motion to exclude the State’s evidence. Counsel argued that evidence was insufficient to support a conviction for any degree of murder or manslaughter. Further he stated there was insufficient evidence from which the jury could be expected to be convinced beyond a reasonable doubt and to a moral certainty of the defendant’s guilt as to any “degree of homicide.”
The motion was overruled, and, after the defense called four character witnesses who testified to appellant’s good reputation, the appellant took the stand in his own behalf.
James Chavers testified that on June 11th he returned home from work shortly after 6:30 P.M., ate supper, and went to the front porch to read the paper. He said his wife, Ethel, joined him on the porch and they discussed the charges for installing a sewer. He told her he had withdrawn fourteen hundred dollars from the bank. Chav-ers said that the only other discussion he had with his wife concerned a bruise on her arm. .He denied discussing the bruise on his wife’s arm at any other place than on the front porch. Chavers went across his yard after remaining on the porch for about ten minutes and had a conversation with a neighbor. Appellant stated that after he walked through the yard he watched his son Carlos pick plums. He then decided to cut the grass at the back of his house. Chavers could not recall how long he remained outside cutting the grass but said that it was “good dark” when the rain started that caused him to come inside.
The appellant testified that he did not have his glasses on at the time but was wearing his “contacts.” He explained that he had had surgery on his left eye for removal of a cataract and that that necessitated the wearing of a contact lens on that eye. Chavers went on to explain that without his contact lens on that eye he “couldn’t see anything.” Further, he said he wore “regular eye glasses when wearing the contact lens” because he could not see well enough to read without them.
Chavers testified that after entering the house he passed through the corner of his children’s room and through the hall into the bedroom that he and his wife occupied. He stated there were no lights on in the hall or in the children’s room. However, he did say there was a small light on in the bathroom. On entering the bedroom he went over to the side of the bed where she was lying and removed the pistol from underneath the bed. Chavers explained that ordinarily when he came in to go to bed he removed the pistol from a footlocker in the bedroom and placed it underneath the bed on the side where he slept. The appellant said “Ordinarily when I’m not home, I put it on her side of the bed.”
Chavers said that on this particular evening when he went outside to cut the grass he had placed the gun on his wife’s side of the bed and as he “got the gun from under the bed to go around I was hit on the head with a vase, some kind of glass substance.” The appellant stated he did not recall making any remarks but did recall shooting the gun. He said that he did not aim the gun at his wife, stepdaughter or son, Carlos. Chavers testified that he did not have any intention of shooting or killing his wife. He said that during this time he did not have on his glasses. The appellant testified that it was “a good while after” the gun was fired that he learned that his wife had been shot. Chavers said he heard his wife exclaim, “James I’m shot” and that at that point he told Cora to call an ambulance and the police.
On further questioning the appellant denied having any conversation with his wife *1100 about a doprknob or any discussion at all with her after he entered the bedroom.
On cross-examination the appellant did not recall placing the pistol under the chair cushion. Chavers said he told the police that the pistol was in the house and that he did not know its location. He denied having any difficulty with his wife or making any threats to her or his stepdaughter, Cora Dickerson, at any time. Further, appellant said that he had not been drinking that night and did not have the pistol on his person while he was cutting the grass.
At the completion of the appellant’s testimony the State recalled Cora Dickerson for rebuttal testimony. She testified that prior to June 11,1975, her stepfather had made a threat against her mother. She recalled that he said: “. . . he was going to kill all of us, and if you want you go and get your people too and I’ll just kill them too.” She said these threats were made on many occasions.
I
The appellant complains that the trial court’s failure to charge the jury with regard to second degree manslaughter in its oral charge and its refusal to give certain written charges were erroneous. Defendant’s requested Charge No. 24, which was refused by the court is as follows:
“The Court instructs the jury that manslaughter in the second degree is included in the charge against the defendant.”
Defendant’s requested Charge No. 26 which was also refused, reads:
“The Court instructs the jury that if you-believe from the evidence in the case, beyond all reasonable doubt and to a moral certainty, that the defendant killed the deceased without malice, either expressed or implied, and without intent to kill or inflict the injury causing death, while committing an unlawful act or while committing a lawful act in an improper or negligent manner, he would be guilty of manslaughter in the second degree.”
The Supreme Court of Alabama in Pierson v. State, 99 Ala. 148, 13 So. 550, said:
“. . . that it is much the safer rule to charge upon all the degrees of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree.” [Emphasis added.]
Therefore, the question presented is whether the evidence adduced at the trial warranted an instruction on second degree manslaughter or, on the other hand, whether the evidence precluded such instruction because it supported the greater offenses charged.
In examining this question several factors must be considered in determining whether error was committed by refusal by the trial court to charge in regard to second degree manslaughter. Some of the cases illustrating these factors are summarized as follows:
In Davis v. State, 31 Ala.App. 508, 19 So.2d 356, we have a factual situation requiring that the jury be charged as to second degree manslaughter. The defendant testified that when his wife, the deceased, while holding their baby, was about to enter their automobile, he attempted to move a shotgun from between the two front seats to the rear seat when the butt of the stock struck the gear lever or steering wheel and the gun was accidentally discharged. The court held that the jury could reasonably have concluded that the defendant was negligent and, under this aspect of the case, the jury should have been instructed on second degree manslaughter.
In the case of Miller v. State, 40 Ala.App. 533, 119 So.2d 197, which was reversed on other grounds, the facts showed that on the morning of the shooting the defendant and her “boy friend” had been -gathering collard greens and while driving home they had an argument during which the deceased slapped the appellant. However, before they arrived at the deceased’s place of residence, the relations between the two had become amicable. Upon arriving at the house the two went into the bedroom occu *1101 pied by the deceased. Thereafter, a witness heard them talking in a friendly manner. About 4:30 P.M., this witness heard a shot and saw the defendant run out of the room saying, “I done shot Sammy, get a doctor.” The defendant testified that the shooting was accidental and occurred when the deceased handed her a breeched shotgun that was loaded. She stated that when she snapped the gun closed it discharged, hitting the deceased. Although this case was reversed because of rulings by the trial court excluding testimony of character witnesses, the court noted that the jury should have been charged as to second degree manslaughter.
Three factors distinguish both Davis v. State, supra, and Miller v. State, supra, from the ease before us now. The first is the absence of witnesses to the killing. Such an absence would in many cases leave open the question of intent. In the case at bar, two witnesses testified that they saw the appellant shoot the deceased and, in our judgment, their testimony would have to be considered in establishing intent, as well as the other elements of the crime. Another factor pointed up in the preceding eases was that only one shot was fired. The evidence in the record of the present case indicated that the weapon used by the appellant was fired between three and five times. The repeated firing of the weapon would tend to show not only the intent.to fire but an intent to harm. Further, in Davis v. State, and Miller v. State, only one person was shot, and in the case before us, the facts show that, during the series of shots fired, one person was killed and another was shot in the hip. Another factor to be considered is the conduct of the parties immediately prior to the shooting. In Miller v. State, a witness testified that the defendant and the deceased spoke to each other in a pleasant manner immediately prior to the shooting. Such evidence would tend to prove the absence of an intention to kill. Here, the testimony of the stepdaughter and the appellant’s son indicated that the appellant was arguing with his wife just before the shooting. The argument was of such a nature that the appellant’s ten-year-old son, in order to protect his mother, struck the appellant over the head. Under these circumstances, it would not be unreasonable to assume that the appellant intended to do harm by the act for which he is charged.
Fulghum v. State, 291 Ala. 71, 277 So.2d 886, the case cited by counsel for both the appellant and the appellee, indicates still another factor to be considered in determining whether a jury should be instructed as to second degree manslaughter. The evidence presented in Fulghum v. State, indicated that the defendant failed to exhibit any emotions of remorse or regret and failed to assist the injured victim after he shot him. On the contrary, he threatened a bystander with harm should he call an ambulance. After the shooting, the defendant, Fulghum, went home and went to sleep. The facts in Fulghum concerned the conduct of the defendant after the injury was inflicted. In the instant case we note that the appellant did not call the police or an ambulance after his wife and stepdaughter were shot. Although he denied any knowledge of concealing the weapon, it was in fact concealed under a cushion of a chair. However, he did later instruct his stepdaughter to call an ambulance. His conduct, although it was not the same as that found in Fulghum v. State, because he did remain at the scene, was certainly not the most commendable.
Under the facts of the present case it was the trial judge’s duty to determine whether there was any evidence tending to show whether the appellant’s conduct was unintentional or accidental, thus requiring an instruction on the elements of second degree manslaughter. We believe the court properly considered the number of shots fired, the likelihood of an argument preceding the shooting, the testimony of eyewitnesses to the shooting and the conduct of the appellant immediately after the shooting. All these factors, we believe, warranted his decision not to instruct the jury with regard to second degree manslaughter.
The Supreme Court of Alabama in Fulghum v. State, supra, stated:
*1102 “. . . The law presumes that a man tends to do what he does. . . . Furthermore, the law infers from the use of a deadly weapon an intent to kill or to do grievous bodily harm. A killing done with a deadly weapon is presumed to have been done maliciously.” [Citations omitted.]
The only evidence presented at trial indicating the shooting was unintentional and accidental came from the lips of the defendant. In our judgment it was not error for the court to refuse to instruct the jury on manslaughter in the second degree.
II
Counsel for appellant contends that it was error for the trial court to refuse to give the following requested Charge No. 28 on good character:
“The Court instructs the jury that good character itself may, in connection with all the evidence, generate a reasonable doubt and entitle the Defendant to an acquittal, even though without such proof of good character you would convict.”
Although this identical charge has been held to be good by the Supreme Court of Alabama, and by this court, the rule is well established that where the same charge is covered in the court’s oral charge, the refusal of a requested charge is not grounds for a reversal. Taylor v. State, 49 Ala.App. 433, 272 So.2d 905; Carson v. State, 49 Ala.App. 413, 272 So.2d 619; Wall v. State, 49 Ala.App. 285, 270 So.2d 831; T. 7, § 273, Code of Alabama 1940, Recompiled 1958.
Our reading of the record indicates this requested charge was substantially covered in defendant’s given requested Charge No. 27, which reads:
“The Court instructs the jury that good character itself is part of the evidence in this case, and if the jury upon consideration of all the evidence have a reasonable doubt growing out of any part of the evidence, the jury will give the benefit of such doubt to the defendant and acquit him.”
Charge No. 28 having been covered, the court did not err in refusing it.
Ill
It is alleged that the trial court committed reversible error when it failed to give defendant’s requested Charge No. 32, on reasonable doubt. It reads:
“The Court instructs the jury that a reasonable doubt is sometimes said to be a doubt for which a reason can be given; it must spring from the evidence in the case. If, after careful consideration of all the evidence you have a doubt arising from the evidence or any part of the evidence of the defendant’s guilt, and any such doubt seems to be reasonable to you, then the defendant should be acquitted.”
The appellant argues that although the trial court did instruct the jury with regard to reasonable doubt, it failed to emphasize to the jury that a reasonable doubt might arise from part of the evidence where the jury weighs all the evidence. It is contended that the defendant sought to present that theory to the jury through defendant’s requested Charge No. 32.
The record reveals that the court gave the following instructions to the jury:
“The Court instructs the jury that a reasonable doubt may arise out of a lack of evidence as well as from the evidence itself. If after a consideration of all the evidence you have a reasonable doubt as to the guilt of the defendant it will be your duty to acquit him.”
Further, we note in Charge No. 27, supra, given at the request of the defendant, the trial court did in fact instruct the jury on this point. The pertinent part of that charge reads:
“. . . and if the jury upon consideration of all the evidence have a reasonable doubt growing out of any part of the evidence, the jury will give the benefit of such doubt to the Defendant and acquit him.” [Emphasis added.]
In our judgment, even though this language came from the charge containing the good character instruction, the particular portion alluded to was part of a conjunctive *1103 sentence including all of the evidence. Furthermore, it was not limited to good character evidence alone.
In view of the foregoing, we believe that requested Charge No. 32 was substantially covered by the court’s oral instruction given as a result of defendant’s given requested Charge No. 27. Therefore, the court’s ruling was proper.
IV
The appellant maintains that the trial court’s refusal to allow, on re-direct examination, “negative evidence in support of good character” was error.
In examining this question concerning negative character evidence, we reviewed the character testimony in question. That testimony in its pertinent parts reads:
“Q All right. Now, during the time that you have known Mr. Chavers over that nineteen-year period, have you come to know his general reputation among his associates?
“A I think that I do; yes, sir.
“Q Is that reputation good or bad?
“A I would say it’s good.”
During cross-examination by the State of this witness the following occurred:
“Q Do you visit Mr. Chavers at home?
“A No, sir, I never have, no more than at work.
“Q So the only knowledge that you have about Mr. Chavers’ reputation and conduct is his reputation where he works?
“A Right.
“Q And you have — do you have any knowledge about his — what his reputation was in the community where he lived or in his family?
“A No, sir, I haven’t come in contact with nobody — .

“Q And its your testimony that his reputation at work about honesty and violence is good?
“A Is good; yes, sir.
“Q But you are unaware of his reputation at home and in his community where he lived?
“A At his job it’s good. I don’t know a thing about after he left.

“Q You never heard anything bad about him?
“A No, sir.
“MR. REYNOLDS: We object.
“THE COURT: Sustained. Ladies and gentlemen, disregard that last answer of the witness . . . .”
We recognize that a defendant has a right to introduce negative evidence in support of his good character. However, the testimony above indicates that as to this particular witness his knowledge of the defendant’s good character was confined to his reputation for good character while on his job.
Wigmore on Evidence § 1616 (3rd ed. 1940), acknowledged:
“But in the condition of life today, especially in large cities, a man may have one reputation in the suburb of his residence and another in the office or the factory at his place of work. . . . There may be distinct circles of persons, each circle having no relation to the other, and yet each having a reputation based on constant and intimate personal observation of the man.”
We note that the above testimony showed two distinct circles of reputation for the appellant, his reputation in the community where he lived and his reputation at his place of work. The testimony, showed that this particular character witness could not properly answer a general character question as to both circles.
If the defendant had sought to confine the negative evidence in support of his good character to the place where he worked, a different question would have been presented. In the present case it is clearly shown that the defendant’s character witness had no knowledge of the defendant’s character within his residential community. The community where all the events of the tragedy occurred was not the place where he worked.
*1104 Reputation, to be provable, must be a general reputation, that is, what is generally said of the person by those among whom he dwells or with whom he is chiefly conversant. Watson v. State, 181 Ala. 58, 61 So. 334; Charley v. State, 204 Ala. 687, 87 So. 177.
In view of the foregoing fact, we believe that the trial court was correct in sustaining the State’s objection to the negative character evidence.
V
The appellant insists that the trial court committed reversible error when it permitted the State to introduce testimony concerning the appellant’s firing of his pistol on prior occasions. Appellant contends the admission of testimony tending to show appellant’s commission of this specific act in the past unfairly impeached him as to a collateral matter and that confusion of issues resulted, requiring appellant to defend against accusations not contained in the indictment. Counsel reasons that since appellant freely admitted at trial that he shot deceased, the only issue for determination was whether his act was accidental. He contends appellant’s actions on earlier occasions would have no relevancy and that to bring them before the jury was prejudicial error.
The record indicates that during re-cross examination the appellant was asked the question:
“Q I believe you were asked had you ever shot that pistol in the floor of your house before.
“A No sir, I never.
“Q Never have?
“A No sir.”

“Q (By Mr. Reynolds) Other than on New Year’s Eve, Mr. Chavers, have you fired that pistol?
“MR. REDDEN: Same objection.
“THE COURT: Overruled.
“Q (By Mr. Reynolds) In the house?
“A No, sir.
“Q Outside the house?
“A No, sir.
“Q Just on that one occasion, New Year’s Eve?
“A New Year’s Eve.”
Later during the rebuttal testimony by Cora Dickerson we find the following:

“Q (By Mr. Patton) Miss Dickerson, let me direct your attention again back to January and February of 1975, and ask you whether or not a shot was fired in your home during that period of time?
“MR. REDDEN: We object to that as being immaterial, not having any probative value on any point at issue in the case, prejudicial, no predicate laid.
“THE COURT: Overruled.
“MR. REDDEN: We except.
“Q (By Mr. Patton) Will you answer that?
“A Yes.
“Q Do you recall who fired that shot?
“MR. REDDEN: Same objection, same grounds.
“THE COURT: Overruled.
“Q (By Mr. Patton) Who fired that shot?
“A My step-father.
“Q And he fired this same pistol?
“MR. REDDEN: Same objection, same grounds.
“THE COURT: Overruled.
“A Yes.
“Q (By Mr. Patton) Where did he fire this shot?
“MR. REDDEN: Same objection, same grounds.
“THE COURT: Overruled.
“A In the kitchen.
“Q (By Mr. Patton) All right. Who was present in the kitchen?
“MR. REDDEN: Same objection, same grounds.
“THE COURT: Overruled.
“A My mother and Carlos.
“Q (By Mr. Patton) All right. Where in the kitchen was this shot fired?
“MR. REDDEN: Same objection, same grounds.
*1105 “THE COURT: Overruled.
“A In the floor.”
In Wright v. State, 279 Ala. 543, 188 So.2d 272, Justice Harwood wrote:
“While these statements in the present case may have prejudiced the appellant in the eyes of the jury, yet, in criminal prosecutions the conduct and declarations of an accused on other occasions are relevant when they tend to shed light on his motives and intentions in doing the act complained of. Hall v. State, 208 Ala. 199, 94 So. 59. Particularly do these statements of the appellant in this prosecution tend to shed light upon whether the shooting was accidental, as contended by the appellant, or was intentional.”
See: Thigpen v. State, 50 Ala.App. 176, 277 So.2d 922; Emerson v. State, 281 Ala. 29, 198 So.2d 613; Mainor v. State, 11 A.B.R. 2098.
In view of the foregoing testimony, although it had a tendency to impeach, the fact that he fired the weapon in the kitchen, where the deceased was, could reasonably be an indication of his motives and intention in doing the act complained of. Certainly this conduct by the appellant tended to shed light on whether the shooting was accidental or intentional.
In this instance the court’s ruling was correct.
VI
It is asserted that on the re-direct examination of Cora Dickerson the State was allowed to go into immaterial matters that had no relevancy to the issues and served only to prejudice the jury against the defendant.
The recitation of the testimony of Cora Dickerson appears in division “V” above and is the evidence that the appellant now says was improperly admitted. The substance of that testimony was that Cora Dickerson was permitted over objection to testify that her stepfather had fired a pistol into the floor of the kitchen while her mother and Carlos were present. Appellant argues that this evidence had no probative value whatsoever and served only to prejudice the jury.
Cora Dickerson’s testimony, despite the fact that it collaterally impeached appellant’s prior testimony, served to show ill will toward the deceased.
The showing of malice and ill will was of probative value on the issue of whether the appellant intentionally or accidentally shot his wife. Although this testimony did attack the appellant’s credibility, the statement did relate to malice material to the issue of whether the shooting was accidental or intentional. Thus under Wright v. State, supra, the trial court’s ruling was correct. Thigpen v. State, supra; Emerson v. State, supra; Mainor v. State, supra.
VII
After a close reading and examination of this record we are convinced that the trial court was correct in overruling the defendant’s motion to exclude and refusing his motion for a new trial.
In reviewing these rulings by the trial court, this court will indulge every presumption in favor of the correctness of the rulings by the trial judge and the decisions thereon rest largely within his sound discretion. Heath v. State, 30 Ala.App. 416, 7 So.2d 579; Espey v. State, 270 Ala. 669, 120 So.2d 904.
The testimony presented by the State through the appellant’s son and stepdaughter was in sharp conflict with the testimony given by the appellant. Such conflicting evidence presented a question for the jury as to the guilt of the defendant unless it failed to make a prima facie case. Morris v. State, 47 Ala.App. 132, 251 So.2d 629; Irons v. State, 42 Ala.App. 349, 165 So.2d 125.
In our judgment there was legal evidence from which the jury could by a fair inference find the defendant guilty of manslaughter in the first degree. Under these circumstances this court has no right to disturb the verdict. Whether such evidence was presented was a question of law; *1106 its weight and probative value were for the jury. Haggler v. State, 49 Ala.App. 259, 270 So.2d 690; Rider v. State, 56 Ala.App. 137, 319 So.2d 756.
AFFIRMED.
TYSON, P. J., and HARRIS and BOWEN, JJ., concur.
BQOKOUT, J., dissents.