LEIGH M. CLARK, Retired Circuit Judge.
On a trial on an indictment charging defendant with murder in the first degree of Jesse Underwood, Jr., a jury found defendant guilty of murder in the first degree as charged and fixed his punishment at imprisonment for life. He was sentenced accordingly.
Defendant had pleaded not guilty and not guilty by reason of insanity. There was no evidence to support his plea of not guilty by reason of insanity, and there is no contention to the contrary.
The undisputed evidence shows conclusively that the alleged victim was killed instantly by a shot from a .16 gauge shotgun in the hands of defendant. Immediately thereafter, the alleged victim’s wife, Dot Underwood, was killed by a shot from the same shotgun while still in the hands of defendant. As the question of criminal responsibility for the death of Mrs. Underwood was not an issue in the instant case, we consider it herein for the sole purpose of any light that it may shed upon the question of criminal responsibility for the homicide alleged herein and upon any of the issues raised on this appeal.
The homicide was another Saturday night tragedy that occurred at Dot’s Lounge on Cleveland Avenue in Montgomery, on May 19, 1979. Dot’s Lounge was operated by Underwood and his wife. During recent months defendant had frequented the lounge. There was also evidence that he had been “running around” with Dot. Loyal to him was his own wife, who testified in his behalf to the effect that he had undergone a great change, for which she manifested sympathy rather than hate, since he started his relationship with Dot and Dot’s Lounge. Testimony of several witnesses for defendant presented a picture of a man of a good general reputation, a hard worker and a man of good judgment and manners. Some of them, however, were not acquainted with his activities after sundown, that is, after working hours, during a few months before May 1979.
As revelry in the form of drinking, gambling and smoking marijuana seemed to prevail for a considerable period before the shooting, the testimony as to what was seen and heard at Dot’s Lounge is not without confusion and equivocation as to details. Perhaps the clearest account, whether altogether true or not, and whether reasonable or not, was presented by defendant himself.
Defendant testified that he had been working Saturday morning, that he quit work in the early afternoon, received a check from his employer that included money that was to be paid sub-employees, that he cashed the check and paid the sub-employees. He planned to go fishing with his wife that afternoon, but she wasn’t at home when he arrived there in the truck. Thinking she had gone fishing at Lucky Lake, he put his shotgun in the truck and went looking for his wife at Lucky Lake, but she was not there. He then went to Dot’s Lounge,, where he engaged in some card games with Dot and others, some beer drinking, and some cigarette smoking of a kind to which he was not accustomed. He said that a woman at the place asked him to give her two dollars, stating that she wanted to get the money together to get “something good” to smoke. Instead of giving her two dollars, he gave her a twenty-dollar bill, with the understanding that she was to take two dollars out of the twenty-dollar bill and return to him the difference. His testimony continued:
“Q. Now, who did you ask for the money?
“A. I asked Dot first and she said she didn’t have it and then I asked Jesse.
“Q. And what did he say?
“A. He told me I would have to ask Dot.
“Q. Did you ask Dot again?
“A. I asked Dot again.
“Q. And what did she say?
*211 “A. ‘Ask Jesse’ and I said, ‘Now, Jesse, you know Dot got my money. Tell your wife to give me my money.’

“A. So I got up, I left and we.nt home to make me some coffee, and I started to kinda losing myself then, and then I came back. I do remember I came back and asked them for my money.

“Q. All right. Let me ask you this. When you got out, did you do anything, on the outside?
“A. Well, I shot the shells out by the lounge in the dirt.
“Q. What kind of shells did you have?
“A. .16 gauge shells of a shotgun.
“Q. What kind of shot did they have in them if you know?
“A. No, sir, I don’t know what kind of shot it had.
“Q. After then'what did you do after you got [shot] the gun in the ground?
“A. So, I walked inside and they asked me, 'Who was that doing that shooting out there?’ I said, T shot that shot out there.’ I said, T just want you all to give me my money so I can go because I’ve got to go to work in the morning.’
“Q. All right. Now where was Jesse at this time?
“A. He was behind the bar.

“Q. When you walked in the front door, where did you go to?
“A. I just walked on in and had the gun down beside me and then he said, ‘Golf [the familiar name by which defendant was called], you ought to be ashamed.’ I said, ‘Naw, I want my money. Just give me my money so I can get the hell out of here.’
“Q. What did he say then?
“A. He said, T told you we didn’t have no damn money for you.’ I said, ‘Jesse, I don’t cuss.’ I said, ‘Are you mad?’ So he said, ‘Did Dot say we don’t have no money for you, we ain’t got no money for you.’ I said, ‘But you know she’s got it, Jesse.’ And then he walked up to the end of the bar and then he stopped.
“Q. Then what happened?
“A. He said to me, he said, T ain’t giving you no money.’ I said, ‘You’re gonna give me my money, Jesse.’ So he said, ‘You got the shotgun.’ I said, ‘Sure.’ I said, ‘But it ain’t for you.’ I said, ‘I just brought it in here.’ I said, T don’t know why I did, but,’ I said, T really want my money.’
“Q. Then what happened?
“A. So, then Dot said, ‘Jesse, we ain’t got no G_d ... damn money.’ So Jesse said, ‘We ain’t going to give you a G.d _ . . damn thing.’ He said, ‘I done shot one Nigger’s _ - out.’

“Q. But he told you he had done shot

“A. One Nigger’s - _ out and mine wasn’t no better. So then I backed up a little piece and when I started to backing up well, then, he started coming on behind me.
“Q. He started where now?
“A. I started to backing up towards the door. I was going to leave, and he started on after me.

“Q. All right. Then what happened?
“A. And then he started coming you know, like he was just going to come, you know, and I’m going to beat him off with the shotgun like this, and he must have got too close, or something. All I know what happened, it just shot.
“Q. Did he ever grab the end of the barrel or not?
“A. I don’t know, sir, whether he grabbed the barrel or what.
“Q. Are you conscious that you pulled the trigger nor not?
“A. The gun shot. I don’t know really what happened right in that time. I don’t know. All I know is it fired off.
“Q. After the gun shot, what happened then?
“A. Well, like Dorothy, she was approaching me, too, and by this time she went to turn back on the table to get — I *212 know she was going to get that pistol off that — out of that pocketbook on the table.
“Q. Now, have you ever seen her with a pistol before?
“A. Yes, sir.
“Q. On how many occasions?
“A. Every time I see her.
“Q. What kind of a pistol was it?
“A. A .38.
“Q. What did it look like?
“A. It was a black or brown handle, I believe it was a brown handle. I’m not for sure, but I do know, it’s a .38 because she used to unload it at the motel lot. I used to tell her not to bring a loaded gun in.
“Q. You said she went for her purse. Is that right?
“A. Yes, sir.
“Q. And you knew the gun was in the purse?
“A. Yes, sir, I knew it.
“Q. What did you do then?
“A. I shot her.
“Q. You shot her. Is that right?
“A. Uh — huh.
“Q. What happened after you shot her?
“A. I set the gun up side the car and went next door to call the police.

Testimony from other witnesses, although in many respects corroborative of defendant’s testimony, differs from his materially in that, according to it, the alleged victim was sitting in a booth at the time he was shot by defendant.
Defendant had great difficulty in attempting to explain why he had the gun in his hands as he returned to the lounge, but he stated that the reason he had the gun with him that afternoon was that he had planned to go fishing at Lucky Lake and that Lucky Lake had snakes in it which he contemplated as targets for his gun.
There was ample evidence to support the verdict of the jury to the effect that defendant with premeditation and deliberation intentionally killed the alleged victim with malice aforethought and that one or more, if not all, of the essential elements of the defense of self-defense were not present. There is no contention on appeal to the contrary.
We do not agree with appellant’s first insistence on reversal on the ground that the trial court erred in refusing the following written charge requested by defendant:
“No. 32
“Manslaughter in the second degree, is defined as the unlawful killing of another human being, without malice and without the intent to kill or to inflict the injury resulting in death, but accidentally committed by the accused while he was doing an unlawful act amounting to a misdemeanor, or accidentally committed by the accused while he was doing a lawful act, but in a grossly negligent or improper manner.”
For authority for the contention, appellant relies exclusively upon Chavers v. State, Ala., 361 So.2d 1106 (1978) rev’g Ala.Cr.App., 361 So.2d 1096 (1977) and Davis v. State, 31 Ala.App. 508, 19 So.2d 356, cert. denied, 246 Ala. 101, 19 So.2d 358. In neither of the cited cases was there a requested written charge that was held to have been erroneously refused that merely stated an abstract principle of law defining or explaining manslaughter in the second degree, as was Charged 32 in the instant case. In each of the cited cases, defendant had requested orally that the court charge upon manslaughter in the second degree as a lesser included offense and excepted to the court’s failure to do so. At no time did the defendant in the instant case request or. make known to the court a position- or a contention that the evidence permitted a finding by the jury of guilt of manslaughter in the second degree. In Chavers, supra, in reversing the trial court, as well as this Court, the Supreme Court based its reversal on the in tandem action of the trial court in failing to charge orally bn manslaughter in the second degree as a lesser included offense and in refusing to give defendant’s requested written charges on *213 the subject. Written charge No. 32 in the instant case would have been misleading and without any field of application, in the absence of an instruction to the jury, which defendant did not request, submitting the issue of manslaughter in the second degree to the jury. The court fully and correctly instructed the jury on the issues as to murder in the first degree, murder in the second degree and manslaughter in the first' degree. It gave the jury a form of verdict as to each, as well as a form for finding defendant not guilty. There was no exception whatever to the court’s oral charge. The trial court should not be placed in error for refusing a written charge as to an issue that defendant did not raise. The refusal of Charge 32 was not error; even if error, the refusal, in the absence of any other instructions on the subject, was not harmful to defendant.
The court refused the following written charge requested by defendant:
“No. 8 The State must prove its charge, and prove it beyond a reasonable doubt by the evidence. The assertions of counsel are not evidence.”
It was held in Morse v. State, 49 Ala.App. 203, 269 So.2d 916 (1972), and Lane v. State, 85 Ala. 11, 4 So. 730 (1887), that the refusal of the identical charge constituted reversible error. Recently the Supreme Court in Lamar v. State, Ala., 356 So.2d 680, 681-682 (1977) rev’g Ala.Cr.App., 356 So.2d 677 (1977), led the way, which we follow, by stating:
“ . . . However, in the instant case, the record does not contain any remarks by counsel for either side. There is nothing to indicate that improper argument was made by the prosecuting attorney. Clearly, assertions made by counsel are not evidence, but it is not necessary in every criminal prosecution that a charge to that effect be given to the jury. If the trial court adequately charges the jury as to what evidence it may properly consider in its deliberations, and adequately charges that the state has the burden to prove its charge beyond a reasonable doubt, it is not necessary that the charge expressly exclude assertions of counsel from the jury. Lane v. State, supra, does not compel a reversal in all instances where the trial court refuses the charges requested by the defendant in this case.”
The record in the instant case shows affirmatively that there was no objection to any of the argument of counsel for either party. The oral charge fully covered the principle that a conviction required that the jury be convinced by the evidence beyond a reasonable doubt of defendant’s guilt. Furthermore, the oral charge contained instructions as follows:
“Now, you are the finder of facts as I told you when the case started out, and I will charge you as to the law. The facts must be found by each and every juror. You are the sole judges as to the weight that should be given to all the evidence in the case. My responsibility is to charge you as to the law. Your arena is the facts. My arena is as to the law, and the law is very clear to me that when a judge steps out of his arena of the law into the arena of the facts which belongs to the jury, he steps into an arena into which he does not belong. .
“Now, you take the testimony of the witnesses together with all proper and reasonable inferences therefrom and apply your common sense and in an honest and impartial way determine what you believe to be the truth. You should weigh all of the evidence and reconcile it if you can reasonably do so, but if there be irreconcilable conflict in the evidence you are to take that evidence which you think is worthy of credit and giv.e it just such weight as you think it is entitled to.”
It should also be noted that at the threshold of the trial, immediately after the jury had been selected and sworn, the court stated to the jury:
“Now, the lawyers will give you an opening statement and tell you what they expect to move [prove] in the case. It will be a brief statement, and by that statement I am instructing the lawyers to be brief. They will tell you what their contentions are, and as soon as that is *214 done we will take a break and then we will come in and have the witnesses sworn individually and they will testify, and that is where you are going to get your evidence from. That is what you will determine the facts from. You won’t determine the facts from the lawyers nor the Judge. They are advocates and I am the one that instructs you as to the law. That is my responsibility, but you are the fact finders and you get the evidence from the witnesses here and anything that is introduced into evidence and is approved by the court as evidence. When that is completed the lawyers will argue their case to you and I will charge you as to the law and then the case will be yours.”
In accordance with what was held and said by the Supreme Court in Lamar v. State, supra, we hold that there was no reversible error in the refusal of defendant’s Charge No. 8.
The only other insistence upon a reversal'pertains to the action of the court in admitting in evidence a .16 gauge shotgun as the gun in the hands of defendant at the time the alleged victim was killed, over the objection of the defendant to the effect that the chain of custody of the gun had not been shown. The gun was introduced in evidence during the testimony of Officer Glenda Roy, who was one of the officers who responded promptly to a report of the shooting. She was only a half-block away from the scene when she received the report. Defendant was still there; she asked him “where was the gun and he pointed right there and there was a shotgun laying -up against a car.” She said she then picked the gun up, placed her “first two initials and my last name and the date scratched on the barrel here.” In other words, she positively identified the particular gun as the only shotgun at the scene. She was not identifying it as the gun that some other person, as a link in a chain of custody, had placed in her custody or in the custody of someone else. We note also that defendant, while testifying as a witness for himself, identified the gun as the gun used by him. The gun was properly admitted in evidence.
Notwithstanding the strong evidence of the good qualities of character of appellant that according to the evidence had been manifested by him for a long time prior to his mingling with the owners and habitues of Dot’s Lounge, and notwithstanding the circumstances of provocation that some of the evidence shows, we are not convinced that the verdict of the jury was wrong or unjust.
We find no error in the record prejudicial to appellant. The judgment of the trial court should be affirmed.*
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur.

 This court affirmed the companion case for the shotgun slaying of Dot Underwood on March 18, 1980, 3 Div. 162, without opinion, all the Judges concurring.