TYSON, Judge.
James Terrell Jones was indicted for capital murder in violation of § 13A-5-40(a)(2), Code of Alabama 1975. The jury returned a verdict of guilty of the lesser-included offense of murder, § 13A-6-2, Code of Alabama 1975, in compliance with § 13A-5-41, Code of Alabama 1975, and as so instructed by the trial court. The trial judge sentenced the appellant to life imprisonment in the State penitentiary and ordered him to pay restitution to the Alabama Crime Victims Compensation Fund in the amount of $1,959.90, which represents reimbursement for monies paid by the victim’s mother for burial expenses.
I
The appellant first contends that the trial judge committed reversible error by refusing to instruct the jury on the lesser-included offense of manslaughter.
The trial judge instructed the jury on capital murder and its applicable components, robbery in the first degree and murder. He then instructed the jury on murder, as a separate offense, and felony murder. The jury returned a verdict of guilty of murder.
The appellant’s counsel filed a written instruction covering manslaughter, which was marked “refused” by the trial judge. At the end of the jury instructions but before the jury retired to deliberate, the appellant’s counsel objected to the trial judge’s failure to include the instruction on manslaughter.
This court in Phelps v. State, 435 So.2d 158, 163 (Ala.Cr.App.1983) clearly enunciated the law in this area:
“The ‘safer’ practice is to charge upon all degrees of homicide: ‘(I)t is much the safer rule to charge upon all the degrees *1158 of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree.’ Pierson v. State, 99 Ala. 148, 153, 13 So. 550 (1892), approved in Williams v. State, 251 Ala. 397, 399, 39 So.2d 37 (1948).
“The controlling principles were stated by our Supreme Court in Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978):
“ ‘An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973). A court may properly refuse to charge on lesser included offenses only (1) when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) when the requested charge would have a tendency to mislead or confuse the jury. Lami v. State, 43 Ala.App. 108, 180 So.2d 279 (1965). In fact, our decisions are to the effect that every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however, weak, insufficient, or doubtful in credibility. Burns v. State, 229 Ala. 68, 155 So. 561 (1934).’ ”
“ ‘(D)ue process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction.’ Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). ‘Under Alabama law, the rule in non-capital cases is that a lesser included offense instruction should be given if “there is any reasonable theory from the evidence which would support the position.” ’ Hopper, citing Fulghum, supra. By statute, ‘(t)he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.’ Alabama Code Section 13A-l-9(b) (1975).”
See also Hill v. State, 485 So.2d 808, 809-10 (Ala.Cr.App.1986); Wyllie v. State, 445 So.2d 958, 963 (Ala.Cr.App.1983) (regardless of how incredible the appellant’s version of the facts may seem).
In the case at bar, the appellant testified that he was invited to the victim’s home on May 15, 1987. The appellant stated that the victim tried to make homosexual advances toward him, but that he, the appellant, refused to cooperate.
The appellant further testified that he was a drug dealer, and that the victim wanted to buy some drugs. He told the victim that the amount which he requested would cost $100.00. According to the appellant, the victim did not have the money, but he gave the appellant a television set and a pistol to hold until the next week, when the victim promised to pay the appellant the $100.00 for the drugs.
The appellant stated at trial that the two men had a discussion about the amount of drugs which were given to the victim. The appellant claimed that the victim got mad because of this discrepancy and because the appellant would not participate in the homosexual activities.
The appellant claimed that the victim angrily left the room, returned and continued to try and touch him, but the appellant still refused. The appellant then testified:
“Q What was his expression, if anything?
“A Like he were mad.
“Q Was he different then than he was before?
“A Yes. It wasn’t like he was a sissy or homosexual anymore, he was more man, like.
“Q What did he say?
“A That I wasn’t going to take his shit like that.
“Q What did you say?
“A ‘I’m not taking nothing, and you’re not getting anything back until you pay me for my dope.’
“Q Then what happened?
*1159 “A Then he said, ‘Bitch, I’m going to kill you.’ He grabbed me on my shirt, I pushed him off; that’s how my shirt got torn.
“Q He said, ‘I’m going to kill you’?
“A ‘Bitch, I’m going to kill you.’
“Q ‘Bitch, I’m going to kill you’?
“A Yes.
“Q And grabbed you by the shirt?
“A Yes.
“Q Do you remember where you were in the house?
“A It was like right out there, from the den.
“Q And he ripped your shirt?
“A Yes.
“Q Is that this piece, right here?
“A Yes, sir.
“Q Does that look like the piece?
“A That is the piece.
“Q State’s Exhibit Number 40?
“A Yes.
“Q He ripped it off your body?
“A Yes, he did.
“Q Did you push him back, or what happened?
“A Yes, I pushed him off me.
“Q What happened next?
“A And then, when he regained his balance, he said, ‘Bitch, you dead.’ He comes up with a knife.
“Q Where did he get the knife at?
“A I don’t know where it come from. Like, come from his clothes.
“Q I show you what’s marked as State’s Exhibit Number 3. Does this appear to be the knife he had?
“A Yes. Yes, it is.
“Q How was he holding it?
“A Like this. (Indicating.)
“Q After you pushed him back, then he came at you with a knife?
“A Yes, he did.
“Q What if anything did you do then?
“A I pulled the pistol out of my pocket that he had gave me.
“Q The pistol that he had gave you?
“A Yes.
“Q You have your own pistol?
“A No. I do not own a pistol.
"Q Huh?
“A No. I do not own a pistol.
“Q Pistol — you pulled the pistol?
“A Yes.
“Q And he came — what happened then?
“A I shoots him in his arm, upper arm. He dropped the knife—
[[Image here]]
“Q Was you attacking him, or not?
“A No, I wasn’t.
“Q Was he attacking you, or not?
“A Yes, he was.
“Q Was he saying something other than what you just testified to— “A No.
“Q —that, ‘You’re dead’?
“A No, he wasn’t.
“Q You shot him, you testified, in the arm?
“A Yes, sir.
“Q What happened then?
“A He drops the knife and grabs his arm and say, ‘Bitch, I’m fixing to kill you, now.’
“Q All at the same time?
“A Yes.
“Q What happened next?
“A He started coming toward me, and that’s when I shot him, twice.
“Q Shot him twice? Two more times? “A Yes.
“Q So the first bullet didn’t stop him? “A No, it didn’t.
“Q You shot him two more times?
“A Yes.
“Q How did he react?
“A He reacted like he was just getting poked by a piece of stick, or somth-ing. (sic) Like it wasn’t hurting him.
“Q Did it stop him?
“A No, it didn’t.
“Q What if anything happened then?
*1160 “A He ganged up on me, and we was struggling over the pistol.
[[Image here]]
“Q He came at you, again?
“A Yes, he did.
“Q Did he grab ahold of you?
“A Yes.
“Q Grab ahold of your shirt?
“A We were struggling. I can’t remember. We was struggling over the pistol. We fell back down in the den. Only thing I remember that I seen he was drawed back to hit me. I closed my eyes, turned my head, and shot, when I took hold of the pistol. He fell down on me. I pushed him off.
“Q You closed your eyes and shot?
“A Yes.
“Q Where did that shot go?
“A I can’t say.”
(R. 508-12.)
The handwritten confession of the appellant, which he also challenges on appeal (see Part II of this opinion), corroborates the appellant’s testimony at trial. The appellant claimed that the victim grabbed his shirt, tearing it in the process, and that the victim pulled a knife on the appellant and threatened him.
Therefore, we find that there was a reasonable basis upon which the petit jury could find that the appellant’s conduct was provoked or was reckless, either of which could have substantiated a verdict of manslaughter. Ala.Code § 13A-6-3 (1975). As a result of examining the evidence, the trial court’s refusal to instruct the jury on the lesser-included offense of manslaughter constitutes reversible error.
II
The appellant further contends that the confession he gave to police should have been suppressed at trial.
On June 1, 1988, a pretrial hearing was held on the appellant’s motion to suppress his statement. Sgt. D.W. Reynolds of the Birmingham Police Department was the investigating officer in this case and was the only witness to testify at the hearing.
Sgt. Reynolds testified that he spoke with Willie Marbury (Killer) about an unrelated case, and Killer implicated the appellant as the one who killed the victim in this case. Sgt. Reynolds arranged a lineup on October 29, 1987, with the appellant being a participant therein. The two witnesses, however, failed to identify anyone as the person seen leaving the victim's home on the morning of May 15, 1987.
That same afternoon, October 29, Sgt. Reynolds interviewed the appellant.[1] He did not give the Miranda warnings at this time. He asked the appellant why Killer would implicate him in the shooting. The appellant did not know and denied having any involvement. The interview, according to Sgt. Reynolds, lasted about ten minutes.
On November 2, 1987, Sgt. Reynolds spoke with the appellant a second time. The Miranda warnings were read, and the appellant signed a Miranda and waiver of rights form. After being told that his fingerprints had been found in the victim’s home, the appellant told Sgt. Reynolds that he wished to make a statement. The appellant claimed that he and Killer were invited to the victim’s home to smoke some pot, but he left after Killer and the victim talked about having sex. The appellant told Sgt. Reynolds that Killer later told him (the appellant) that he killed the victim.
On November 3, 1987, Sgt. Reynolds questioned the appellant for the third time. Again, a Miranda and waiver of rights form were read and signed by the appellant. Sgt. Reynolds told the appellant that his fingerprints were found on the television which was taken from the victim’s home.[2] On this occasion, the appellant told Sgt. Reynolds that the victim owed him some money. The appellant said that he *1161 and Killer got into the victim’s car and went with the victim to his house. While there, the victim tried to attack Killer with a knife, whereby Killer shot him. Sgt. Reynolds asked the appellant about his inconsistencies. The appellant told Sgt. Reynolds that, if he would come back the next day, he would tell him the true story.
As per- the appellant’s request, Sgt. Reynolds again spoke with the appellant on November 4, 1987. The appellant was again advised of his Miranda rights, and he signed a third form. Sgt. Reynolds stated that no promises, threats, inducement or coercion were used to get this appellant to give a statement on any of the occasions that he[1] was questioned. The appellant handed Sgt. Reynolds a two-page handwritten confession. The appellant stated that it was incomplete, but he would tell him the rest of the story. The statement and his comments were consistent with his testimony at trial. {See Part I of this opinion.) He told Sgt. Reynolds that he would finish writing the statement for him.
The next day, November 5, 1987, Sgt. Reynolds collected a completed handwritten five-page document, which was signed and dated by this appellant. Again, the completed statement was entirely consistent with the appellant’s testimony at trial. Sgt. Reynolds stated that he did not Mir-andize the appellant on this occasion, since he only went to the jail to collect the completed statement.
The crux of the appellant’s argument regarding this issue is that, once an accused asserts his right to counsel, a law enforcement officer may not continue to question a suspect in a given criminal matter. Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).
Our review of the record, however, fails to reveal that Sgt. Reynolds was ever made aware that this appellant was being represented by legal counsel while he was incarcerated in jail. In fact, Sgt. Reynolds testified that the appellant never told him that he was being represented by an attorney, nor did he request an opportunity to speak with his attorney. (R. 659, 661, 675.)
As to this issue, we find no error in the trial judge’s determination that the statement at issue was not obtained in violation of the appellant’s constitutional rights.
Nonetheless, based on the error found in Issue I as herein addressed, this cause is due to be, and the same is hereby, reversed and remanded for a new trial.
REVERSED AND REMANDED.
All the Judges concur.

. The appellant was incarcerated in the Jefferson County Jail on unrelated charges on this and the other occasions that he was questioned about the death of Michael Lamar Anthony.

. Sgt. Reynolds admitted that no fingerprints were found either in the victim’s home or on the television set. He told this to the appellant only as a "last-resort" effort to find out the truth.