The appellant was charged with the first degree murder of one Roy Washington, Jr., "by stabbing him with a knife" (R. p. 189). The jury returned a verdict of guilty of first degree murder, fixing punishment at life imprisonment. The trial judge then set sentence accordingly. From the denial of his motion to exclude the State's evidence and the refusal of the requested affirmative charge, both challenging the sufficiency of the evidence, the appellant prosecutes this appeal.
Mrs. Viola Washington, mother of the deceased, testified that she last saw her son alive on August 4 before his death on September 3, 1977. Mrs. Washington saw her son lying dead on September 3, 1977, in the yard of Patricia Woods.
Mrs. Elizabeth Woods testified that she and her daughter, Patricia, lived at 1812 15th Street, Southwest, Birmingham, Jefferson County, Alabama. On the evening of September 3, 1977, Mrs. Woods and her daughter were at home when they heard a disturbance in the street in front of their house. Mrs. Woods stated that she saw the appellant and the deceased arguing while the appellant's brother, James Bythewood, watched. Mrs. Woods heard the deceased say, "Give me my stuff, man" (R. p. 11). Mrs. Woods saw a stick in the deceased's hand, but she did not see him strike the appellant with it. Mrs. Woods testified that she saw the appellant begin to stab the deceased with a knife resembling a small butcher knife. Mrs. Woods stated that the deceased ran into her yard with the appellant chasing him. Mrs. Woods said that she tried to stop the appellant by shouting at him, but he continued to stab the deceased with the knife even after the deceased had fallen to the ground. Mrs. Woods identified several photographs taken by the police at the scene where the deceased's body lay. These photographs were then admitted into evidence by the trial judge.
According to Mrs. Woods, the appellant walked away from the scene after the incident. Soon thereafter the paramedical unit and the police arrived.
Jay M. Glass, medical examiner with the Jefferson County Coroner's Office, testified that, on September 3, 1977, he performed a post-mortem examination on the body of one identified to him as Roy Washington. Mr. Glass was shown to possess the qualifications and experience in his field necessary to qualify him as an expert. Mr. Glass stated that his examination of the deceased revealed three stab wounds to the body. There was one wound in the deceased's back, one wound to the right shoulder and one wound in the central chest. Mr. Glass testified that the wound in the central chest penetrated the deceased's heart, thereby causing death. Mr. Glass identified several photographs taken by him of the deceased during the post-mortem examination at Cooper Green Hospital. These photographs were subsequently admitted into evidence by the trial judge.
Patricia Ann Woods testified that she lived with her mother, who previously testified, at 1812 15th Street, Southwest, Birmingham, Jefferson County, Alabama. Ms. Woods testified that she saw the appellant, his brother and Roy Washington in front of her house on the evening in question. Ms. Woods stated that the appellant and Roy Washington were arguing with each other. In addition to hearing Roy Washington say, "Give me my stuff, man," Ms. Woods heard the appellant reply, "I'm not going to give you nothing" (R. p. 48). At this point, the appellant stabbed the deceased, who fled into the Woods' yard. The appellant chased *Page 1172 
and caught the deceased, who fell to the ground. The appellant stood over the deceased and stabbed him repeatedly.
After the appellant left on foot, Ms. Woods called the police and an ambulance. Ms. Woods stated that the ambulance arrived within fifteen minutes. Ms. Woods identified a photograph, which showed the front of her house in relation to the location where the deceased was found by the police. This photograph was admitted into evidence over objection.
Officer Roy L. Williams, Jr., a patrolman with the Birmingham Police Department, testified that, in response to a police radio dispatch, he proceeded to the scene of the incident in question at about 6:00 p.m. on September 3, 1977. When he arrived, the paramedical unit was already on the scene. Officer Williams identified a photograph, subsequently admitted into evidence, showing the deceased lying where he was found. This photograph also showed a stick lying beside the deceased.
Officer Jerry Dale Frazier, a patrolman with the Birmingham Police Department, testified that, in response to a police radio communication, he proceeded to 1701-B 14th Way, Southwest, in Birmingham. There he arrested the appellant at about 8:30 p.m. on September 3, 1977. Officer Frazier stated that, at the time of his arrest, the appellant appeared to be sober.
At the close of Officer Frazier's testimony, the State rested its case. The defense moved to exclude, which motion was denied by the trial judge.
The case for the defense consisted of the testimony of the appellant and his brother. The appellant testified that he had known the deceased for about three months prior to the incident in question. On September 3, 1977, the appellant, his brother and the deceased met about 8:00 a.m. Together they went to the store and purchased some wine and beer. From there the three went to the vacant lot across the street from Mrs. Woods' house where they spent the entire day talking and drinking. The appellant said that about fifteen minutes until 6:00 p.m., the deceased demanded of the appellant that he furnish more drink. When the appellant could not provide anything further to drink, the deceased picked up a stick and began to beat the appellant with it. The appellant stated that he responded by throwing bricks at the deceased.
On cross-examination, the appellant admitted that he stabbed the deceased about three times. The appellant stated that the actual stabbing occurred in Mrs. Woods' yard. However, the deceased was still standing and using the stick to fight when the wounds were inflicted, according to the appellant. After the stabbing, the appellant dropped the knife on his way out of the yard.
The appellant recalled that he was arrested later that night at home and taken to the Ensley Precinct. There he was photographed and questioned by Sergeant C.M. Melton. At this point, a voir dire examination of the appellant was held to establish the requisite predicate for any discussion of the appellant's statement.
On voir dire examination, the appellant stated that he could not remember being given the Miranda warning, informing him of his constitutional rights. Sergeant Melton, a detective with the Birmingham Police Department, was called to the stand. Sergeant Melton testified that he and Coroner Jack Helton were present during a taped interview with the appellant at about 9:45 p.m. on the night of September 3, 1977. Sergeant Melton stated that, prior to the appellant's interview, no threats of force, promises, inducements, hope of reward, or any improper influences were made or offered in order to get the appellant to make a statement. Sergeant Melton testified that the appellant was informed of his rights under the Constitution by reading to him a standard Miranda card warning used by members of the Birmingham Police Department. Sergeant Melton stated that the appellant said he understood his rights. The interview with the appellant was tape recorded and transcribed. Sergeant Melton later checked the transcription against the tape for accuracy and found it to be accurate. *Page 1173 
At the close of Sergeant Melton's testimony on voir dire, the trial judge ruled that the appellant's statement was voluntarily given. At this point, the jury was returned to the courtroom and the cross-examination testimony of the appellant continued.
The remainder of the cross-examination of the appellant consisted of attempts to impeach the appellant, using specific questions and answers given in the statement. In his statement to the police, the appellant usually responded by saying, "I don't know." On cross-examination, when asked whether, on September 3, 1977, he made a certain specific response to a certain specific question, the appellant would either answer in such a way as to indicate that he clearly did not understand the question or the appellant would answer, "I don't know." Finally, by way of impeachment, the State brought out that the appellant had been convicted on three occasions in the past of grand larceny (R. p. 113).
Following the appellant's testimony, the trial judge, suasponte, instructed the jury on the proper purpose of impeachment testimony. The judge cautioned the jury that it should consider the testimony relating to prior grand larceny convictions solely as an aid in evaluating the witness' credibility. "Such testimony," the judge warned, "should not be used in determining the defendant's guilt or in fixing his punishment if found guilty" (R. p. 115).
James Bythewood, brother of the appellant, testified that he witnessed the altercation between his brother and Roy Washington on September 3, 1977. The witness stated that the deceased struck the appellant a couple of times with a stick before the appellant stabbed the deceased. The witness stated that he thought the argument was about some eight track tapes. James Bythewood testified that his only involvement in the incident was his verbal attempt to stop it. After the stabbing occurred and the appellant had gone, the witness waited at the scene until the ambulance and the police arrived.
On cross-examination, the State attempted to impeach the witness concerning a statement he allegedly made to the police on September 9, 1977. The witness denied saying to the police that the appellant did not kill Roy Washington in self-defense. The witness recalled that he had been drinking wine all day on the day of the incident in question. Finally, the State brought out that James Bythewood had been convicted of burglary on a prior occasion.
After the testimony of James Bythewood, the trial judge again instructed the jury on the proper consideration of evidence of prior offenses. Thereafter, the defense rested.
On rebuttal, the State called Birmingham Police Evidence Technician Robert Zeanah, who testified that he photographed the appellant at the Ensley Precinct on the night of September 3, 1977. The photographs were admitted into evidence. The appellant had stated earlier on cross-examination that he did not recall being photographed at the police station.
Further rebuttal evidence was heard from Sergeant Melton, who had previously testified. Sergeant Melton testified to the same facts which had earlier led to the trial judge's ruling that the appellant's statement was voluntarily and intelligently given. Sergeant Melton identified a cassette tape, marked State's Exhibit Eleven, as being the recording he made of the interview with the appellant at about 9:45 p.m. on September 3, 1977, at the Ensley Precinct. Sergeant Melton stated that the tape recording had been in his exclusive custody and control continuously since that date. Sergeant Melton identified State's Exhibit Twelve as being a typed transcription of the appellant's interview, which he had earlier checked for accuracy. The State was then allowed, over objection, to play for the jury the tape marked as State's Exhibit Eleven while Sergeant Melton followed the text of the transcript with instructions to point out any discrepancies between the transcript and the tape recording.
Sergeant Melton stated that, on September 9, 1977, he interviewed James Bythewood, brother of the appellant, in his home. On that occasion, according to Sergeant *Page 1174 
Melton, James Bythewood said that the stabbing of Roy Washington was not done in self-defense. During a subsequent interview, on September 12, 1977, at City Hall, Sergeant Melton recalled that James Bythewood said he had "grabbed" his brother in an effort to break up the dispute.
Following Sergeant Melton's testimony on rebuttal, the State rested. The trial judge then gave his oral charge to the jury, to which no exceptions were taken. Thereafter, the jury retired to consider its verdict.
 I
Appellant contends that his brother was improperly compelled by the trial judge to give his opinion when such constituted a legal conclusion or the application of a legal definition. Appellant has misinterpreted that portion of the record wherein he alleges error. The State's question was framed in terms of whether James Bythewood had previously told the police, on September 9, 1977, that his brother did not kill Roy Washington in self-defense. The appropriate response was either "Yes" or "No." The question clearly did not seek to elicit the witness' opinion as to whether or not the killing was done in self-defense.
Appellant collaterally asserts error occurred when the trial judge allowed Sergeant Melton to state on rebuttal that James Bythewood told him, on September 9, 1977, that his brother did not kill Roy Washington in self-defense. We find no error in the above-described questioning of the witness, James Bythewood, and the witness, Sergeant Melton. On the contrary, the strategy used by the State was a classic example of impeachment of a witness' credibility by the use of a prior inconsistent statement. Lawson v. State, 36 Ala. App. 438,57 So.2d 643 (1952).
 "When a witness, on cross-examination, denies that he made a statement out of court which is inconsistent with his testimony on direct examination, the only available move for the impeaching party is to bring on an impeaching witness who can testify as to the prior inconsistent statement of the witness being impeached. . . ." Gamble, McElroy's Alabama Evidence, § 157.01 (1) (3d Ed. 1977) and cases therein cited.
 II
Appellant asserts that the trial judge relied on incompetent and inadmissible evidence in making the determination on voir dire that appellant's statement was admissible. The evidence presented was the testimony of Sergeant Melton and the unsigned transcription of the tape recording of the interview. It is noteworthy that Sergeant Melton testified that the transcription was accurate and that the tape recording itself was available to the judge for his consideration. The jury did not see the transcription; the tape recording was played for the jury. Moreover, as has been shown hereinabove, the proper predicate for the introduction of the appellant's statement was laid by the State.
In Carter v. State, 53 Ala. App. 43, 297 So.2d 175 (1974), this Court stated:
 ". . . The voluntariness of an alleged confession is a question of law for the court and should be decided by the trial court upon preliminary proof, showing the circumstances surrounding the alleged confession, taken outside the hearing of the jury, and such finding will not be disturbed unless it appears contrary to the great weight of the evidence or is manifestly wrong. . . ."
We find that the trial judge did not abuse his discretion in considering the transcription of appellant's statement. Furthermore, nothing in the record indicates that the judge's action was either contrary to the great weight of the evidence or manifestly wrong. Thus, there is no merit to appellant's assertion of error in this regard.
 III
Appellant argues that his statement was admissible solely for impeachment purposes since it contained no inculpatory material. Appellant, therefore, was entitled to have given to the jury a limiting instruction even *Page 1175 
though none was requested. Despite this assertion, appellant cites us to cases wherein such limiting instructions were requested and denied. See Jones v. State, 23 Ala. App. 395,126 So. 178 (1930); Baugh v. State, 215 Ala. 619, 112 So. 157
(1927). These cases provide no support for appellant's argument.
In United States v. Diaz, 585 F.2d 116 (5th Cir. 1978); and in United States v. Beasley, 513 F.2d 309 (5th Cir. 1975), rehearing denied, 521 F.2d 815, appeal after remand,545 F.2d 403, rehearing, 563 F.2d 1225, the United States Court of Appeals for the Fifth Circuit found error where such limiting instructions were not given sua sponte. However, the facts in each of these cases are distinguishable from the circumstances of the instant case. Diaz, supra, and Beasley, supra, are, therefore, inapposite to the facts of the instant case.
The appellant, having failed to request the proper instruction below, cannot now be heard to complain for the first time on appeal. Slinker v. State, Ala.Cr.App.,344 So.2d 1264 (1977). Absent a request for the proper limiting instructions, failure to give them is proper.
We have carefully reviewed the record in this cause and find same to be free of error. The judgment is due to be and is hereby
AFFIRMED.
All the Judges concur.