George Warren Reese was charged by indictment with the first degree murder of one Russell Dewitt McWhorter "by stabbing him with a knife" (Volume II, R. p. 262).
The jury returned a verdict of guilty of murder in the first degree and fixed punishment at life imprisonment. The trial judge then set sentence in accordance with this verdict.
From the denial of the appellant's motion to exclude the State's evidence and the overruling of his motion for a new trial, challenging the weight and sufficiency of the State's evidence, the appellant prosecutes this appeal.
Mr. Dewitt McWhorter stated that he resided at 213 Willos Street, Trussville, in Jefferson County, Alabama, on the night of Friday, January 26, 1979, and was the father of Russell Dewitt McWhorter. Mr. McWhorter explained that his son had just finished high school and was employed at Anderson Electric Company in Leeds. He stated that his son lived at home with him, and he last saw his son alive about 8:30 on Friday evening, January 26, 1979. He stated that he saw his son's body shortly after midnight that same evening, just off Willow Lane in the Roebuck section of Birmingham, Jefferson County, Alabama. He stated that he identified his son's body at that time.
Carla Reid stated that she was presently living in Houston, Texas, with her mother and her sister, Cindy, and that she and her sister had formerly lived in Birmingham with their aunt, Nina Evans, during the fall of 1978 and the winter of 1979. Carla Reid stated that, on Friday evening, January 26, 1979, she rode to a bar and lounge known as Al's Cross Roads with a friend of her sister named Kim Cope. Carla stated that the girls did not have dates that evening, and after being at the lounge a short time she spoke to a young man by the name of Russell McWhorter, who walked up to her as she was watching the band play and introduced himself. She stated that she also knew the appellant, Warren Reese, and had been dating Warren over the two month period prior to January 26, 1979. She stated that Warren Reese was accompanied that night by his friend, Robert Magro. Carla stated that she had only talked with Russell McWhorter about five minutes when Warren Reese gestured for her to come to him. He asked her who the guy was and she replied that she did not know, that she had just met him. Reese stated, "Well, why are you talking to him?" Carla replied, "I was just standing there and he spoke to me and started the conversation." Carla related that Warren Reese then stated, "Well, I don't like him talking to you," then later told her, "Well, I'm gonna beat his butt." *Page 109 
Carla Reid related that shortly thereafter Warren told her he and Robert Magro were going to ask Russell if he wanted to go outside and smoke a joint. She stated that Warren then went to get Robert Magro, who was playing pool. Carla stated that she spoke to Russell while Warren was gone, and in a few minutes Warren reappeared with Robert Magro. She then saw Russell McWhorter leave Al's Cross Roads with Warren and Robert, and a fourth male, a friend of Russell's, named Kelley Latta, who was dating Russell's sister.
Carla Reid stated that Warren Reese was wearing blue denim jeans and had on faded earth shoes, and Russell also had on jeans with a light beige shirt or jacket. Carla stated that she and her sister, Cindy, remained at Al's Cross Roads and did not see Warren Reese until the following day, Saturday, January 27, 1979. She said she received a telephone call from Warren Reese, that he asked her to go out with him that evening, and stated that Robert Magro wanted to take Cindy out also. She stated that the two boys picked them up shortly after 8:00 at her aunt's home and they were in Robert Magro's black Buick automobile. Carla stated that she was fourteen years of age and that Cindy was seventeen. She stated they rode with the boys to a place called Spats, in Homewood, where they went in and the boys ordered some drinks. Carla stated that a man spoke to her and she replied, "Well, how are you?" About that time Warren walked up, slammed the drinks on the table, and asked who the man was. She told him that she did not know who he was, but that she had seen him once before. Carla stated that Warren grabbed the man and shoved him against the wall. A Homewood policeman came up about that time, and she, Warren, Cindy, and Robert decided to go some other place. Upon getting into Robert Magro's automobile, Warren stated that he wanted to go to Brother's Music Hall, but Cindy insisted that they all four go to Al's Cross Roads. Robert spoke up and said that since he was driving they would go to Al's.
While driving to Al's, Carla stated she asked, "Did you hear about this guy getting stabbed down by the Cross Roads last night?" Cindy replied, "Yes, he got stabbed five or six times, or something like that." Carla then said, "I hear he is dead. That's bad, because somebody killed him." She said that Warren then said, "He is dead?" She said he seemed surprised, but he then clapped his hands and said to her, "He won't talk to you anymore." Carla stated that neither she nor Cindy had a chance to finish their drinks earlier at Spats because of Warren's conversation with the man, but after they got to Al's the boys bought them another drink. She stated that, soon after they arrived at the Cross Roads, Warren and Robert left. From the record (R. pp. 39-42):
 "Q. Now, you said that Warren had to leave the Cross Roads.
"A. Yes.
"Q. Why did you have to leave the Cross Roads?
"A. Because he hit me.
"Q. When?
 "A. See, it had been about twenty minutes after we got there and I was standing there watching the band and he was standing there beside me, behind the light stage stuff and he was mad because my sister hadn't come back yet —
 "MR. GWIN: I object and ask that it be excluded, Judge.
 "THE COURT: All right. Disregard that, ladies and gentlemen.
 "Q. Don't go into what somebody may have been mad about something, okay?
"A. Okay.
"Q. Did you have words about something?
"A. Yes, sir.
"Q. An argument or something?
"A. Yes.
"Q. What happened when you had the argument?
"A. He hit me really hard.
"Q. Where?
"A. Right in my face.
"Q. Which side?
 "A. Right here (indicating). I didn't even see him hit me, I just saw stars. *Page 110 
"Q. Where did you go?
 "A. I went to the bathroom. This guy caught me and I went in the bathroom.
"Q. How long did you stay in there?
"A. I stayed in there about fifteen minutes, crying.
"Q. When you came out was Warren still there?
 "A. Yes. A whole bunch of girls and him and the cops was standing outside the girls' bathroom waiting for me to come out.
"Q. After that occurred, he had to leave?
 "A. Yes. The cop asked me if I wanted to put him in jail or bar him. And, I said, I will just bar him, he can't come back in.
 "Q. In other words, bar him for the night, put him out?
"A. Keep him out.
 "Q. Okay. There was an off-duty officer working there?
"A. No. He was on duty.
"Q. I mean, he was in uniform?
"A. Yes.
 "Q. But, there is always an officer working there, isn't there?
"A. Yes.
 "Q. I think you have already answered this. When he left you didn't go outside?
"A. No.
"Q. You don't know what happened outside?
"A. No.
 "Q. Now, let me ask you this. How many times had you ever been out in this car of Robert Magro's with Warren?
"A. Just once.
"Q. Just that night?
"A. Just that night.
 "Q. During the time that night — either the night before or that night, while you were with either Warren Reese or Robert Magro, or in the presence of either one of them, did you ever see either one of them with any kind of a weapon?
"A. No.
 "Q. Did you ever see any kind of a weapon on the following night while you were in Robert Magro's car?
"A. No.
 "Q. Do you recall when you found out that this person who had been killed was Russell McWhorter?
"A. Yes. It was Saturday night before we went out.
"Q. Before you went out?
"A. Yes.
 "Q. Did you realize at that point that that was the person that you had talked to and met the night before?
 "A. I was kind of, but I wasn't sure about it, you know. I was surprised.
 "MR. BARBER: Your Honor, that is all I have of her at this time. But I would reserve the right to recall her.
"THE COURT: All right."
On cross-examination, Carla stated that she and Cindy had formerly lived in Clearwater, Florida, with their mother, but that Cindy had come to Birmingham to be with her aunt about three months before she came because their mother was ill. She stated that they were then living in Houston, Texas, with their mother. Carla stated that the night of Saturday, January 27, 1979, was the only time that she and her sister double-dated with Warren and Robert, and that she had no particular plans to meet the boys the previous night when they saw them at Al's Cross Roads. She stated that they had ridden over there with Kim Cope. She stated that Warren and Robert came in on Friday night between 10:00 and 10:30 and that it was just a short time later when Warren saw her talking with Russell McWhorter and gestured for her to come to him. She stated that she only had one Jack Daniels and Coke before meeting Russell McWhorter and speaking to him. She stated that Russell did not buy her a drink, and it was just a few minutes later that he and Kelley Latta left with Warren Reese and Robert Magro.
Carla Reid further stated that, prior to Friday, January 26, she had not seen Warren threaten any other person or strike anyone, and that he had not struck her before. She stated that she had only seen him get mad once, and that was with a former roommate, also named Robert. *Page 111 
Carla was asked if she, on Saturday night, after coming out of the ladies' bathroom, saw either Warren or Robert again, and she replied, "No," that they had been asked to leave. She also stated that, on Friday evening, she did not see either of the four men after they left the bar around 11:00, or shortly thereafter, and that she and Cindy remained at Al's Cross Roads, then Kim Cope took them home.
Cindy Diane Reid, sister of Carla Reid, testified that she and Carla were then living in Houston, Texas, with their mother. She stated that her mother and father were divorced, and the two girls had formerly lived in Clearwater, Florida, with their mother. She stated that she had first come to Birmingham to live with her aunt and was joined about two months later by her sister, Carla.
Cindy recalled a Friday night, on January 26, 1979, when a girl friend, Kim Cope, had picked her up, together with her sister, Carla, and they had ridden to Al's Cross Roads. She stated that a fourth girl, Tracy Gant, might have gone there with them. Cindy stated they did not have plans to meet anyone in particular, but they did see George Warren Reese and his friend, Robert Magro, at Al's. Cindy stated that Carla had been dating Warren Reese, about six or eight weeks prior to the Friday night in question. She said that this Friday night was the first time she met Robert Magro, and that Warren had introduced him to her. She stated that she was talking with a group of people on Friday night and remembered seeing Warren and Robert leave with two other men, but that she was not paying that much attention. She later found out that the other two men's names were Russell McWhorter and Kelley Latta. Cindy stated that she and Carla remained at Al's until 1:00 or 2:00 in the morning, and Kim Cope, their friend, drove them home.
Cindy stated that the next day Warren Reese called and talked with Carla. She and Carla agreed to go out with Warren and Robert Magro that night. The two boys picked them up at their Aunt Nina Evans' home about 8:00 p.m. They rode in Robert Magro's car to Spats Lounge off the Green Springs Road near Homewood. Cindy stated the boys bought some drinks and she saw some man speak to Carla. Carla answered him, but when Warren returned with the drinks he was mad and asked Carla what she was doing. She saw Warren grab the man and push him against the wall. About this time a policeman came up, and Warren then came back to the table. The four of them left the lounge and got in Robert Magro's Buick. Cindy stated there was some conversation in the car about going somewhere else, but that she wanted to go to Al's Cross Roads, and Robert agreed. Later, Carla said, "Did you know that a guy got killed last night at Cross Roads?" Cindy replied, "Yes, he got stabbed five or six times in the chest." She said that her girl friend, Tracy Gant, had called her and told her about a man being stabbed the previous night. She said that the name of Russell McWhorter could have been mentioned, but that it did not mean anything to her. She said that Carla stated, "He is dead, too." She said that Warren Reese clapped his hands and said, "He is dead?" She said that she did not hear anything else.
Cindy related that, after they arrived at the Cross Roads on Saturday night, Robert Magro went off to play pool, and she was talking with someone else when she was told that Warren had struck her sister. She then went looking for Carla.
On cross-examination Cindy stated that she attended Huffman High School, having entered the fall of 1978 in her senior year. She stated that she met Warren Reese one night after Carla came to Birmingham where both of them were living with their aunt, but that she had not been out with Robert Magro before Saturday, January 26, 1979. Cindy indicated that she met him the previous night, Friday, while they were at the Cross Roads. She stated that she and her sister had been to the Cross Roads a number of times. She stated that she was talking with a boyfriend, Michael McClentock, on Friday night when she saw Warren *Page 112 
and Robert leave with two other boys, but she was not paying that much attention. She said that she really did not remember talking with Russell McWhorter or Kelley Latta that Friday night.
She stated that, on Saturday night, she did not see Warren strike Carla after they went to Al's Cross Roads, but she went in the bathroom and saw Carla crying, and Carla had a big red mark on her face. Carla told her that Warren had hit her. Cindy said that she went outside, and Warren asked her to find Robert Magro as they wanted to leave Al's.
Kelley Latta stated he was nineteen and lived on Tyler Loop Road. He stated that he had attended Huffman High School where he knew Russell McWhorter. He stated that, on Friday evening, January 26, 1979, he went to Al's Cross Roads in Roebuck, alone, but met his friend, Russell McWhorter, while there. He stated that he was dating Russell's sister some at this time. That night he and Russell McWhorter met Warren Reese and Robert Magro. He said he had never seen either of them before. Kelley Latta stated that, after talking with the two men, the four of them left Al's Cross Roads and got into a black Buick driven by Robert Magro. He stated that he and Russell got on the back seat and Warren Reese sat on the passenger's side on the front. He stated that this was a two-door car. He said there had been no special conversation between the four of them other than they mentioned riding around looking for some girls. He stated that someone mentioned something about going to East Lake Park, and that he remembered Warren Reese saying that the car belonged to Robert, and that it was a Cutlass. He stated that they rode out Parkway East to the intersection of U.S. 11 where they turned off, then turned onto Willow Lane. He stated that something was mentioned about smoking Marijuana, and they turned and headed to a dead-end street, which he later recognized as Roebuck Forest Drive, which intersected with Lisa Lane. Latta stated that they pulled in, turned around, and backed up to the dead-end where they stopped about five or ten feet in front of the underbrush. Latta stated the four of them then got out of the automobile and stood near the back, and that Russell McWhorter lit up a Marlboro green cigarette. He then saw Warren Reese light up a Marijuana cigarette and start passing it around. He stated that he took a puff and handed it to Robert Magro. He said that, in just a few minutes, he heard Warren Reese say to Magro, "Are you ready?" Magro replied, "Any time." From the record (Volume I, R. pp. 114-115):
"Q. Then what happened?
 "A. Then a few minutes passed and then he drew back —
"Q. Who drew back?
 "A. Warren Reese drew back and, I guess I could say, stabbed at Russell.
 "Q. All right. What did he do — show us — when you say — come down here and go through the motions that Warren Reese made when he moved in the manner that you are trying to describe.
 "A. (Witness goes in front of jury) He just reached — fumbling in his pocket and then he just drew back and went like that (indicating).
 "Q. How many steps did he have to take to get to where Russell was?
 "A. I don't recall exactly, it wasn't more than two, I don't believe.
 "Q. When he started that movement, was he still standing in this area here?
"A. Well, he was a little closer.
"Q. He had moved a little closer?
"A. Yes.
"Q. Okay. Have a seat back on the witness stand.
"A. (Witness retakes witness stand)
"Q. Kelley, did you see where he struck Russell?
 "A. Yes. It was in the vicinity of the center of the chest.
"Q. As you have indicated on your own self?
"A. Yes.
 "Q. Let me ask you this, Kelley. Did you see anything in Warren Reese's hands when he struck at Russell? *Page 113 
"A. No, sir. I just saw a flash and that was it.
"Q. You saw a flash, but you don't know what it was?
"A. No, sir.
"Q. When did you see the flash?
"A. Just before his hand reached him.
 "Q. What did Russell do when Warren's hand struck him?
"A. He just moaned and started falling backwards.
"Q. Was Russell on the pavement?
"A. Yes, sir."
Latta stated that he then ran for help and that he thought he heard some steps behind him as he ran through a couple of yards. He said that he then saw a light in a house, ran up on the porch, and exclaimed, "We are not narcs." Latta stated he turned around because he thought someone might be following him and saw the outline of a person down the street. He then opened the door of the house and went in as the door was unlocked. He found two people in a room in the back of the house watching television. Latta spoke to them and they called the police and an ambulance. Latta stayed in the house, looking out the window, until the ambulance arrived. He stated he then ran back to the dead-end street and found the body of Russell McWhorter. He stated he was present when the police arrived and made photographs of the scene. Latta stated that Robert Magro was leaning against the back of the car when he last saw him. He stated that there had been no words of anger or arguing whatever prior to the time that Warren Reese struck Russell McWhorter.
On cross-examination, Latta stated he was employed at W.C. Wiler Heating and Cooling Company, and that he had known Russell McWhorter since high school. He said that he had dated Russell's sister some. Latta stated that he first arrived at Al's Cross Roads sometime after 9:30 or 10:00 o'clock and had had a couple of beers that night. He stated that he did not know Warren Reese or Robert Magro prior to that night, and that Russell McWhorter apparently did not know them either. Latta indicated that he and McWhorter attended Hewitt High School in Trussville. He stated that, on Friday night after leaving Al's Cross Roads, as they were riding out Highway 11, he mentioned something to Robert about the general area, and that Robert had turned onto Willow Lane looking for a place to stop and smoke the Marijuana.
Latta indicated that he had been at the Grayson Valley Country Club from about 7:00 until around 9:00 p.m. when he rode around a short time with two friends near Center Point. He dropped them off and then he went down to Al's Cross Roads. He stated that he had not had anything to drink prior to going to Al's Cross Roads.
Latta indicated that not more than five minutes had passed after the four men had gotten out of Magro's automobile to smoke the Marijuana before he heard Reese say, "Are you ready?" Then Magro replied, "Any time."
On cross-examination, Latta admitted that he had first stated he thought Reese's hand was open, but had made the statement that his fists were doubled up at one time in a prior proceeding. He admitted that he did not see a knife, but did see a flash, which he inferred was the knife blade. He stated that he was five feet nine inches tall, and that Russell McWhorter was slightly taller than he. He stated that Russell was wearing blue jeans and a tan shirt with a motorcycle sticker on the back on the night in question.
Robert A. Adams, III, stated he was an ambulance driver for Hank's Ambulance Service on the night of Friday, January 26, 1979, and was working the night shift. He stated he received a call about 11:30 p.m. and rode to Lisa Lane, which runs off Roebuck Forest Drive. He stated that he arrived at the scene shortly before midnight and that it would not have taken them more than five or ten minutes to drive there after getting the dispatch. He stated that Roebuck Forest made a dead end not far from the intersection of Lisa Lane. He stated at the dead end they found the body of a young white male, and that he and his *Page 114 
partner stayed there until the police arrived. After the police officers came, Adams indicated that he and his partner turned the body over and opened the shirt and pants of the victim, but found no vital signs. He observed a number of stab wounds on the body of the victim, and he was directed by the police to take the body to Cooper Green about an hour later.
On cross-examination, Adams indicated that he met another boy, named Kelley Latta, there that night while the police were examining the area.
Birmingham Police Officer George Cooley stated he was working the 11:00 to 7:00 o'clock shift the night of January 26, 1979. Cooley indicated he received a call at 11:42 p.m. from a radio dispatch to go to an area near the intersection of Lisa Lane and Roebuck Forest Drive. He stated it took him approximately five minutes to get there as he was near Huffman High School when he received the call. Upon arrival he observed Hank's ambulance near the dead-end area of the street. He drove up and there observed the body of a young white male. He checked for vital life signs and found none. He called for the patrol division and evidence technician, then remained with them while photographs were taken of the body and the general area. Cooley indicated no weapons were found and that he only found a partly empty package of cigarettes in the deceased's pocket. He stated that he talked with a young white male, named Kelley Latta, that night and obtained a statement. He then remained to assist in securing the area. Cooley stated that the following night he was on duty and rode past Al's Cross Roads. He saw a black Buick that answered the description he had been previously given. He stated that this car was parked behind the Cross Roads, unoccupied, and locked. He stated that he ran a check and found who the car was registered to, and that other officers were also watching the vehicle. He stated that he then answered another call, then returned. When he came back, George Warren Reese and Robert Magro had been arrested by two other officers. He stated that he assisted Lieutenant Walker in making an inventory of the black Buick and took Magro to jail. The other officers transported Reese. He described the automobile as being a black Buick Century.
Jay M. Glass testified he was a Chief Medical Investigator of the Jefferson County Coroner's office and had performed a number of autopsies. He examined the body of Russell McWhorter, whom he described as weighing 147 pounds, being five feet, seven inches tall, and found eight separate stab wounds in the front, or anterior portion of the body. He determined that these wounds varied from one and one-eighth, four and one-half, five, and one wound was six inches deep. He stated the cause of death was due to "shock and hemorrhage" due to cuts to the chest (Volume II, R. p. 204).
On cross-examination, Mr. Glass indicated that any of four of the eight wounds on the body of Russell McWhorter would have been fatal.
Ray Baker and John W. Barksdale, Jr., testified that they both lived on Roebuck Forest Drive, and on the night of Friday, January 26, 1979, they heard noise and saw some lights near the dead end of Roebuck Forest Drive, then later saw police officers investigating around midnight where they found the body of a white male. Barksdale indicated that he and his wife saw a car backing down the road, and that it then backed away suddenly.
Ginny M. Cope stated that she lived at 709 Lisa Lane on January 26-27, 1979, and was employed in the X-ray Department at Cooper Green Hospital. She stated she was watching television some time after 11:00 on the night in question with a friend when a young white man came down the hall saying, "Anyone home, anyone home?" She then telephoned for both the police and an ambulance. She stated that this person remained, looking out the window, until the police arrived. She stated that she spoke to the police officers that night, but did not leave her home.
At this point the appellant made a motion to exclude the State's evidence, which was overruled. *Page 115 
Cathy Williams testified that she was seventeen years of age and attended Ensley High School. She stated that she had formerly dated Warren Reese. She recalled, back in the fall, around December of 1978, during Christmas, she was at Ensley Park with Warren when Robert Magro drove up in his car and and started throwing a large knife, making it stick in a tree. She stated that Robert had two cars and that one of them was a Buick. She did not remember ever seeing Warren with a knife or throwing one.
The appellant did not take the stand and testify at trial.
At the conclusion of an extensive oral charge, each side announced, "Satisfied."
 I
Appellant first asserts that the trial judge arbitrarily denied his motion to grant the appellant Youthful Offender status and hear the case accordingly, citing us to Clemmons v.State, 294 Ala. 746, 321 So.2d 238 (1975).
From our examination of this record, we have determined that Judge Gibson, pursuant to Section 15-19-1, Code of Alabama, 1975, made a proper investigation pursuant to the appellant's petition and denied his motion.
The record discloses that a Youthful Offender Investigation Report is dated February 5, 1979, and is set forth in Volume II, Record pages 267-269. It is apparent that Judge Gibson was aware of this report prior to the time of appellant's arraignment and had gone over same.
As pointed out in Morgan v. State, Ala.Cr.App.,363 So.2d 1013 (1978), the act in question does not require a full, formal hearing.
As noted by Judge Bowen in Morgan:
 ". . . While we have no indication of why youthful offender status was denied in this case, the trial judge is not required to state his reasons for denying youthful offender status. This court will not overturn that exercise of discretion except where it affirmatively appears that the decision of the trial judge was arbitrary or made without some examination or investigation of the youthful offender. Watkins v. State, 357 So.2d 156 (Ala.Cr.App.), cert. denied, 357 So.2d 161 (Ala. 1977)."
The petition in question was properly denied.
 II
Appellant next asserts that the trial court erred in overruling his motion to exclude the State's evidence and his motion for a new trial, challenging the weight and sufficiency of the evidence in this case.
It is clear from the testimony of both Carla Reid and Cindy Reid that the appellant had a quick temper and resented any male speaking to Carla Reid. His hostility is fully demonstrated through the testimony of these two witnesses. Moreover, Kelley Latta indicated in his testimony that he saw George Warren Reese strike at the chest of Russell McWhorter and observed a flash, apparently from a knife. He heard McWhorter moan and saw him sink to the ground before he, Latta, fled to seek assistance. Just prior to the assault, he heard Reese state to Magro, "Are you ready?" and Magro replied, "Any time." We also have in the record the statements of Reese made the following evening to Carla Reid concerning the knifing the previous evening.
As noted by this Court in Kontos v. State, Ala.Cr.App.,363 So.2d 1025 (1978):
 "The question to be decided is whether vel non the evidence presented by the State prior to the motion to exclude, if believed by the jury, would be sufficient to convince the jury beyond a reasonable doubt of the defendant's guilt. Randolph v. State, 100 Ala. 139, 14 So. 792 (1894); Morton v. State, Ala.Cr.App. (1976), 338 So.2d 423, cert. denied, Ala., 338 So.2d 428. It is apparent that much of the State's evidence in this case was circumstantial. However, it is well settled that circumstantial evidence may afford satisfactory proof of the corpus delicti in a *Page 116 
murder prosecution, and, if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury. Scroggins v. State, Ala.Cr.App. (1976), 341 So.2d 967, cert. denied, Ala., 341 So.2d 972 (1977). See also, Young v. State, 283 Ala. 676, 220 So.2d 843
(1969). "While mere speculation, conjecture, or surmise, will not authorize a conviction, the jury is under a duty to draw whatever permissible inferences it may from circumstantial evidence and to base its verdict on whatever permissible inference it chooses to draw. United States v. Strickland, 509 F.2d 273
(5th Cir. 1975)."
Under the evidence presented by the State in this cause, it is clear that a prima facie case was presented and the trial court properly overruled the appellant's motion to exclude the State's evidence and further properly ruled on the appellant's motion for a new trial challenging the weight and sufficiency of the state's evidence. Means v. State, 51 Ala. App. 8,282 So.2d 356, cert. denied, 291 Ala. 792, 282 So.2d 359 (1973);West v. State, 54 Ala. App. 647, 312 So.2d 45, cert. denied,294 Ala. 775, 312 So.2d 52 (1975); Douglas v. State, Ala.Cr.App.,333 So.2d 880 (1976); Jones v. State, Ala.Cr. App.,362 So.2d 1303 (1978); Bythewood v. State, Ala.Cr.App., 373 So.2d 1170, cert. denied, 373 So.2d 1175 (1979).
We have carefully examined this record and find same to be free of error. The judgment is therefore
AFFIRMED
All the Judges concur. *Page 181