Alice Marie Wyllie was convicted of murdering her husband, William Phillip Wyllie, by shooting him with a 16-gauge shotgun. She was, subsequently, sentenced to life imprisonment.
On March 9, 1982, the appellant shot and killed her estranged husband, William Phillip Wyllie. The circumstances surrounding this shooting incident were in dispute at trial.
Lieutenant Jerry Anderson and Sergeant Jean White of the Fairhope, Alabama, police department testified that, shortly after the shooting, the appellant drove to the Fairhope Police Department and reported to them that she had just shot her husband. She gave no explanation for the shooting. She gave Sergeant White the shotgun that she had used and a box of shotgun shells.
Lieutenant Anderson drove to the victim's home where he found the victim, as the appellant had described, lying on his back near the driveway. The victim was dead when Anderson arrived. The cause of death was a combination of injuries caused by gunshot wounds to the victim's left leg, just below the knee, and to the left side of the victim's chest. The latter wound was inflicted from a distance of eight to eleven feet.
Paul Buck testified that on the day of the shooting, he had solicited the assistance of Mark Wyllie, the son of the appellant and Mr. Wyllie, to move an ice machine. He arrived at the Wyllies' home at about 10:45 a.m. to pick up Mark.
The appellant, who was not living there at the time, arrived at the residence at about the same time and asked Buck if he was there to pick up some lumber. After he replied "no" the appellant told him that her husband had stolen forty-four thousand dollars worth of lumber from her and that she was going to put a stop to it. She further explained that when she got through there would be a bloody mess. Buck and Mark left, but returned a short time later and told Mr. Wyllie what the appellant had said.
The appellant claimed that the shooting was justified in self-defense.
She testified that she had filed for divorce two years prior to the shooting, but that the divorce proceedings were never finalized. She moved out of the family home (the scene of the instant shooting) because Mr. Wyllie and her son, Mark, had threatened to kill her, and Mark had beaten her.
Although she did not deny shooting her husband, she did deny making the statements to Buck which implied a motive for the shooting and her intent on the day of the shooting. She explained that she merely asked Buck not to "bother" her lumber.
After her conversation with Buck, she left and picked up J.C. Parker, a carpenter, who had agreed to help repair some of her rental property. She returned with Parker to the Wyllies' home. The appellant testified that when they arrived, Mr. Wyllie told her he was going to cut her throat. Mr. Wyllie, eventually, got "real loud." Shortly thereafter, Parker left to get his truck to transport the lumber needed for the rental repairs. While the appellant waited in her car for Parker to return, Mr. Wyllie "came at her." She feared for her safety because *Page 960 
he had his hand in his pocket, and she knew that he usually carried a knife. When at her request, he would not stop running toward her, she loaded her shotgun and fired the shot that hit him in the leg. Because that shot did not stop him, she moved behind her car and shot him again in the chest. She testified that she could not really see him when she fired the second shot because she was blind in her right eye.
On cross-examination the appellant stated that she could not have driven away and avoided the fatal conflict, because her arthritis prevented her from reacting quickly enough to move from the passenger's side of her car and over the shotgun to the driver's seat in time to drive away.
A defense witness, Charles Whatley, verified that Mr. Wyllie usually carried a knife. Another defense witness, Grady Gibson, confirmed appellant's testimony concerning an incident nine months before the shooting, when Mr. Wyllie had beaten the appellant with his fists.
J.C. Parker testified in rebuttal that he was on the premises when the appellant shot her husband. Although his back was turned, Parker heard Mr. Wyllie say "You can't have that lumber, that's mine," after which he heard the first gunshot. He turned around in time to see the appellant fire the second shot as Mr. Wyllie was falling to the ground. He testified that Mr. Wyllie was not charging the appellant when she fired the second shot and that she did not fire the second shot over the top of her automobile, as she had claimed.
Neither a knife nor any other weapon was found on or near the victim after the incident. The appellant, in fact, admitted that she never saw any such weapon.
Several character witnesses testified for the appellant and several rebuttal witnesses testified that the appellant had a reputation for being mean and violent.
Cathy Stewart was called as a hostile witness by the state. She denied telling the authorities that the appellant told her that she, the appellant, planned to kill Mr. Wyllie. This denial was impeached by members of the Baldwin County District Attorney's Office, who testified that Stewart had, indeed, told them that the appellant said she planned to kill Mr. Wyllie.
The sufficiency of the evidence is not challenged on appeal.
The appellant contends that the trial court erred in permitting the state to examine Cathy Stewart as a "hostile" witness and to impeach her testimony with other witnesses.
Cathy Stewart was called by the state as a rebuttal witness. She was not called by the state during its case in chief, nor as a witness for the appellant. Before she was called as a witness in rebuttal, a conference was held out of the jury's presence to qualify her as a "hostile" witness. The prosecution explained that, a few days after the shooting incident, Stewart, appellant's hairdresser, told members of the Fairhope District Attorney's Office that, prior to the shooting, the appellant had told her, that she, the appellant, intended to kill Mr. Wyllie. This prior statement was verified in chambers by the assistant district attorney to whom Stewart, allegedly, made the statement. The prosecution further explained that it would have called Stewart during its case in chief except for the fact that it learned, during the course of the trial, that Stewart had decided to deny that she told the authorities about appellant's threat. Because of Stewart's business connections with the appellant, as appellant's hairdresser, and because of the expected change in Stewart's testimony, the prosecution asked the trial court to designate Stewart a "hostile" witness so that it might, in effect, cross-examine her and impeach her, if she denied making the prior statement concerning appellant's alleged threat against Mr. Wyllie. The state further explained that this information was originally intended as evidence of appellant's intent, to refute appellant's claim of self-defense. In light of the evidence proffered by the state in chambers, the trial court permitted the state to examine Stewart as a "hostile" witness. *Page 961 
The trial court did not err in designating Stewart a "hostile" witness. Such a determination was within the sound discretion of the trial court, and, under the circumstances herein presented, there was no abuse thereof. Anderton v.State, 390 So.2d 1083 (Ala.Cr.App.), cert. denied,390 So.2d 1087 (Ala. 1980); Lewis v. State, 414 So.2d 135 (Ala.Cr.App.), cert. denied, 414 So.2d 140 (Ala. 1982); but see, Wiggins v.State, 398 So.2d 780 (Ala.Cr.App.), cert. denied, 398 So.2d 783
(Ala. 1981), and Walker v. State, 416 So.2d 1083 (Ala.Cr.App. 1982) (where different facts and circumstances evidenced that certain witnesses were not "hostile").
After Stewart had been confronted with her alleged prior statement and had denied that appellant had made the threat and had further denied that she, Stewart, had told the authorities of such a threat, the state impeached her by presenting both witnesses to her prior inconsistent statement. They testified in the jury's presence that a few days after the shooting, Stewart told them of appellant's threat. The appellant contends that the use of these two impeaching witnesses was a violation of the rule prohibiting impeachment of one's own witness.
"It is well settled in Alabama that if a party's own witness denies having made a prior inconsistent statement, testimony from another witness that he made the statement is not admissible." (Emphasis supplied). Harris v. State,428 So.2d 124, 125 (Ala. 1983), affirming, 428 So.2d 121 (Ala.Cr.App. 1981), citing Randolph v. State, 331 So.2d 766 (Ala.Cr.App.), cert. denied, 331 So.2d 771 (Ala. 1976); and Isbell v. State,57 Ala. App. 444, 329 So.2d 133, cert. denied, 295 Ala. 407,329 So.2d 140 (1976). In the usual case a party placing a witness on the stand "thereby vouches for his credibility, and cannot impeach his own witness." See, Ward v. State, 376 So.2d 1112,1116 (Ala.Cr.App.), cert. denied, 376 So.2d 1117 (Ala. 1979).
This rule has been consistently applied where a party, during direct examination of its own witness, is "surprised" by testimony that is inconsistent with prior statements or prior testimony from that witness. See, Randolph v. State, supra;Harris v. State, supra. When a party's own witness gives testimony inconsistent with a prior statement, the "surprised" party may then be permitted to "interrogate him, lead him, in effect cross-examine him, in order (1) to refresh the recollection of the witness or (2) to show surprise of the party who called the witness," Randolph v. State, supra, but he is not permitted to impeach his witness with other witnesses.
In the instant case, however, the state did not call Stewart as its own witness, and, consequently it never "vouched for" Stewart's credibility. It presented Stewart as a "hostile" or adverse witness for examination purposes, and had her so designated by the trial court. Under these circumstances, where a witness has been properly declared "adverse" or "hostile," prior to examination before the jury, that witness may be treated by the calling, or presenting, party as a witness for the opposition. Anderton v. State, supra. "This allows the party calling the adverse witness to examine the witness by use of the tools available to him on cross-examination including contradiction and impeachment." Anderton v. State,390 So.2d 1083, 1086, supra; see also, Lewis v. State, supra; Moulds v.State, 426 So.2d 942 (Ala.Cr.App. 1982). It is, of course, proper impeachment of an opponent's witness to prove prior inconsistent statements with the testimony of impeaching witnesses. Bythewood v. State, 373 So.2d 1170 (Ala.Cr.App.), cert. denied, 373 So.2d 1175 (Ala. 1979); Allen v. State,390 So.2d 676 (Ala.Cr.App. 1980), and cases therein cited.
Although the state in Anderton did not have to resort to the use of impeaching witnesses (because the "hostile" witness admitted the prior inconsistent statements and attempted to explain them to the jury) Anderton, nevertheless, paved the way for the use of impeaching witnesses in the instant case. As is the case with a court's witness, the examination of a "hostile" witness, as authorized by Anderton, can be *Page 962 
justified "in the interest of truth and justice" within the sound discretion of the trial court because the so-designated "hostile" witness "may be able to shed light upon the issues."See, Anderson v. State, 35 Ala. App. 111, 44 So.2d 266 (1950);Kissic v. State, 266 Ala. 71, 94 So.2d 202 (1957); Moulds v.State, supra.
Impeachment of a designated "hostile" witness, pursuant to the Anderton rule, is also consistent with the liberal impeachment now authorized in federal courts. See, Fed.R.Evid.607.
Curiously, the Anderton rule creates an obvious distinction between the pre-designated "hostile" witness, who can be impeached with other witnesses, and the "surprise" witness, who, because he has already been "vouched for," cannot be impeached with other witnesses. Such a distinction could be eliminated by the adoption of a rule similar to the federal rule on impeachment of witnesses. See, Fed.R.Evid. 607.
In light of Anderton and its progeny, we must conclude that the trial court did not err in permitting the state to impeach Stewart with other witnesses.
The appellant further contends that the trial court erred in refusing to give her written requested charges on the lesser included offenses of manslaughter and criminally negligent homicide. The trial court, after reviewing the requested charges, told the appellant, before it gave its oral charge to the jury, that no lesser included offense instructions would be given because the evidence "did not merit giving of the same." The appellant excepted to this ruling.
Lesser included offense instructions, generally, shall not be given "unless there is a rational basis for a verdict convicting the defendant of the included offense." Ala. Code §13A-1-9 (b) (1975); Pennell v. State, 429 So.2d 679
(Ala.Cr.App. 1983).
The trial court, apparently, ruled that there was no "rational basis" for a verdict of manslaughter or criminally negligent homicide.
The trial court was correct in ruling that the evidence did not support a charge on criminally negligent homicide. There was no evidence whatsoever that appellant's actions were the result of "criminal negligence," as required in § 13A-6-4 (a), Code of Alabama 1975, and defined in § 13A-2-2 (4), Code of Alabama 1975. The state's evidence proved that the appellant "intentionally" shot and killed Mr. Wyllie without justification or provocation. The appellant never denied that she "intentionally" shot and killed him. Her evidence tended to prove only that she shot him in self-defense. No theory of the evidence would have supported a charge on criminally negligent homicide. See, Phelps v. State, 435 So.2d 158 (Ala.Cr.App. 1983).
The trial court did err, however, in ruling that the evidence did not support a charge of manslaughter.
In explaining her theory of self-defense, the appellant testified that, when she arrived at the Wyllies' home with Parker, Mr. Willie threatened to cut her throat with his knife. She stated that she believed this threat was real because he had beaten her before and because he always carried a knife. She explained that after she had retreated to her car and Parker had started home to get his truck, Mr. Wyllie ran toward her with his hand in his pocket. She feared that he was about to make good his threat. She was unable to slide over to the driver's side of the car and drive to safety, but she was able to load her shotgun and protect herself. She stated that when Mr. Wyllie, at her insistence, would not stop his charge, she fired at his feet to stop him. She then backed around behind her car and, because the first shot did not stop him, she fired again at close range. She indicated that she did not actually see Mr. Wyllie at the instant of her second shot because he was on her blind side. As soon as she realized she had stopped her husband's alleged attack, she drove to the police station for help. She admitted, however, that she never saw the knife with *Page 963 
which Mr. Wyllie had, allegedly, threatened her.
Appellant's testimony was presented in support of her claim of self-defense to prove that she was, indeed, justified in killing her husband. Implicit in appellant's version of the facts was the theory that she was provoked by her husband's imminent attack upon her. If believed, appellant's version of the facts might have provided a "rational basis" for a conviction of manslaughter pursuant to § 13A-6-3 (a)(2), Code of Alabama 1975. But see, Pennell v. State, supra (evidence did not justify a manslaughter instruction). However incredible appellant's version of the facts might have been, in light of the state's convincing evidence to the contrary, there was evidence of sufficient provocation to reduce the offense from murder to manslaughter. See, Reeves v. State, 186 Ala. 14,65 So. 160 (1914); Roberson v. State, 217 Ala. 696, 117 So. 412
(1928). Under these circumstances the jury would have been authorized to find the appellant guilty of only manslaughter, as the result of an imperfect claim of self-defense.
Although the labels have now changed with the restructuring of homicide offenses in Alabama's new Criminal Code, the analyses applied in Reeves and Roberson still apply. The factual circumstances of Roberson, wherein the defendant claimed self-defense and provocation for shooting his victim, are very similar to those of the instant case. The Roberson
court emphasized that "a defendant who claims self-defense is not thereby precluded from asserting that the homicide was committed under circumstances reducing it to manslaughter, where the evidence before the jury would so authorize." The weight and credibility of appellant's evidence was a matter exclusively within the province of the jury and a proper manslaughter charge was warranted. Dennis v. State, 112 Ala. 64,20 So. 925 (1896); Roberson v. State, supra. Although the new code restructuring of homicide offenses has helped somewhat, the difficulty of distinguishing between murder and manslaughter in any given case still exists. Therefore, it is still much the safer rule to charge upon all the degrees of homicide included in the indictment when a party is on trial for murder. Dennis v. State, supra; Reeves v. State, supra;Roberson v. State, supra; Phelps v. State, supra, and cases therein cited.
The trial court heard appellant's evidence of self-defense and thoroughly instructed the jury as to the proof necessary to support such a defense and as to limitations, including the "duty to retreat," that might negate it. The same evidence that warranted instructions concerning the elements of self-defense and appellant's "duty to retreat" also warranted instructions on the lesser included offense of manslaughter.
Although a proper manslaughter charge was warranted, appellant's written requested charges covering manslaughter would, ordinarily, have been justifiably refused because they neither defined the offense nor explained the proof necessary for a manslaughter conviction. Chavers v. State, 361 So.2d 1106
(Ala. 1978), reversing, 361 So.2d 1096 (Ala.Cr.App. 1977). InChavers, the requested charge merely stated that the lesser included offense, second degree manslaughter, was included in the charge against the defendant. Nevertheless, the Alabama Supreme Court ruled that the failure to give this "simple" charge was reversible error. The court's ruling was based upon criticized precedents and the fact that the defense attorney specifically excepted to the trial court's refusal to give his requested charges and excepted to the trial court's failure to instruct the jury on the offense of second-degree manslaughter.See, Chavers v. State, supra, and specific cases therein cited.
As in Chavers, appellant's requested manslaughter charges merely stated that manslaughter was an offense included in the charge against the appellant. On the authority of Chavers, we must, therefore, hold that even though the requested charges were "simple," the trial court committed reversible error in refusing to charge on manslaughter. *Page 964 
The state argues that, pursuant to Allen v. State,414 So.2d 993 (Ala. 1982), affirming, 414 So.2d 989 (Ala.Cr.App. 1981) and the resulting new temporary rule of criminal procedure, A.R.Crim.P.Temp. 14, the appellant failed to properly preserve this issue for our review. The state correctly asserts that the appellant was required to state the matter to which she objected and the grounds of her objection. Allen v. State, supra.
The appellant contends, and we agree, that she sufficiently stated, to the trial court, "the matter to which she objected" when, after the trial court stated that it would not give any lesser included offense instructions, she reserved an exception thereto, and, subsequently, excepted to the trial court's refusal of her requested charges. See, Johnson v. State,433 So.2d 479 (Ala. 1983), affirming, 433 So.2d 473 (Ala.Cr.App. 1982). As in Johnson, however, the appellant, arguably, failed to adequately set forth the specific grounds for her objection. She did not state to the trial court, in the record, a theory upon which a charge of manslaughter was warranted. Had she espoused such a theory, perhaps the trial court would have been persuaded to give the manslaughter charges.
Nevertheless, we feel that the requirements of Allen andJohnson were fulfilled in the instant case and the issue was properly preserved.
As explained above, the same evidence that supported the trial court's detailed instructions on self-defense also supported the requested manslaughter instructions. The trial court was obviously aware of this evidence when it told the appellant that lesser offense instructions would not be given because the evidence "did not merit giving of the same." Appellant's immediate exception to this ruling sufficiently complied with the requirements of, and policies behind, theAllen rule. Under these circumstances further argument to the trial court, assuming such argument would have been allowed, would have been futile.
Because the trial court refused to instruct the jury on manslaughter, although there was a "rational basis" to support such a charge, appellant's murder conviction below cannot stand.
In light of this reversible error, we pretermit a detailed discussion of the alleged errors in the trial court's instructions concerning appellant's "duty to retreat" under the instant circumstances. In the record before us the existence or non-existence of such a "duty to retreat" appears to have been a jury question properly submitted to them by the trial court. In the event of a retrial, the propriety of "duty to retreat" instructions will be governed by the evidence therein presented.
For the error herein noted, this cause must be reversed and remanded.
REVERSED AND REMANDED.
All the Judges concur.