The appellant, Robert Clifton Williams, was convicted of murder, a violation of § 13A-6-2, Code of Alabama 1975, in the killing of his stepson, Michael Crittendon. The appellant was sentenced, as a habitual offender with one prior felony conviction, to life in prison. The appellant contends that the trial court erred by refusing to charge the jury on "heat-of-passion" manslaughter.
Charlie Orr, a friend of the appellant's, testified at trial that on May 14, 1991, he and the appellant had planned to go fishing. After digging some bait, the appellant asked Orr to take him to Linda Yarbrough Fuqua's house so that he could talk with Brenda Jackson, Michael Crittendon's girlfriend, about some money that Jackson and Crittendon owed him. Orr complied.
The appellant entered Fuqua's house. Orr testified that while he waited for the appellant in the car, he could hear people arguing inside Fuqua's house. Orr testified that Michael Crittendon arrived and went into the house. Shortly after Crittendon went inside, Orr saw the appellant come out of the house, with his hand in his pocket, and then turn around and go back inside. Orr testified that a very short time later, the appellant came out of the house again and got into the car.
Orr and the appellant then went fishing as originally planned. Orr testified that en route to the river, the appellant told him that he "got to fighting" (R. 19); however, Orr said that he did not think much of the appellant's comment at the time. Orr stated that while he was fishing, some detectives arrived looking for the appellant. He told them that the appellant had gone to get another rod and reel. Orr stated that one of the detectives told him that Crittendon was dead, which, Orr said, surprised him.
Brenda Jackson testified that while she was at Linda Yarbrough Fuqua's house, the appellant arrived looking for her. Jackson testified that initially Fuqua would not let the appellant in and that she told the appellant that Jackson was not at the house; Jackson said that Fuqua subsequently relinquished and let the appellant in. Jackson was in another room of the house when the appellant came in, but she could hear the appellant yelling and cursing. When Jackson entered the living room area where the appellant was, she and the appellant began arguing. She denied owing the appellant any money.
Jackson testified that while she was arguing with the appellant, Crittendon arrived and an argument then ensued between the appellant and Crittendon. According to Jackson, Crittendon had been drinking alcohol that morning and he was acting "high." (R. 37.) Jackson testified that the appellant kept calling Crittendon vulgar names. She testified that during the argument, Crittendon sat down and asked her to fix him something to eat. Jackson said that when she refused, Crittendon went into the kitchen and returned with a piece of cheese. Jackson testified that at that point, the appellant left the house and then immediately returned, whereupon Crittendon walked toward the appellant. She stated that as Crittendon approached the appellant, the appellant pulled a knife out of his pocket and stabbed Crittendon in the chest. After stabbing Crittendon, the appellant looked at Jackson and called her an "M.F." (R. 320) and said that he was going to "mess" her up also (R. 320). The appellant came toward Jackson with the knife and cut her in the back as she tried to get away from him. After cutting her, the appellant left the house.
Elizabeth McNeal, an officer with the Decatur Police Department, was patrolling the area in her vehicle when she was flagged down by a young girl and told that there had been a stabbing at Fuqua's house. When Officer McNeal arrived at Fuqua's house, she found Crittendon sitting in a chair, bleeding profusely. An ambulance was called and Crittendon was taken to the hospital, where *Page 539 
he subsequently died as a result of a stab wound to his heart.
Thomas Little, an officer with the Decatur Police Department, testified that around 11:30 a.m. on the day of the incident, he located the appellant walking down the road. Officer Little testified that after obtaining the appellant's name, he told the appellant that he needed to talk with him. About that time, Sergeant Jep Tallent and Sergeant Boyd, with the Decatur police department, arrived. Officer Little read the appellant his rights and then patted him down. A knife was found in the appellant's right front pants pocket during the patdown. The appellant told Officer Little that the knife was his and that he had used it in the stabbing. The appellant was placed in Officer Little's patrol car and was transported to the police department. According to Officer Little, while the appellant was in the patrol car waiting to be transported, the appellant spontaneously asked him what he would do if a larger man jumped on him. Officer Little testified that the appellant also told him that he had "stuck" (R. 70) Crittendon with a knife.
Sergeant Tallent testified that before the appellant was transported to the police department, but after he had been read his rights, the appellant told him that Crittendon owed him some money and that he had "jigged" (R. 81) Crittendon a little. The appellant also told Sergeant Tallent that he was afraid of Crittendon because, he said, Crittendon was bigger and stronger than he was, and he was afraid Crittendon was going to attack him because, he said, Crittendon "liked to fight." (R. 82.)
Sergeant Tallent and Sergeant Johnny Coker subsequently interviewed the appellant at the police station. Both Tallent and Coker testified that the appellant appeared to have been drinking but that he seemed to be in control of his faculties and that he knowingly and voluntarily waived his rights. Sergeant Coker reduced the appellant's statement to writing, and this statement was admitted into evidence at trial. In the statement, the appellant told the police:
 "Today I was going fishing with Charlie Orr. We went down 3rd Street and I saw my stepson, Mike Crittendon. I asked Mike where my money was that he owed me. Mike said he didn't have the money. And told me to go see his girlfriend, Brenda Jackson. Mike said Brenda was over at Linda's apartment. [Linda] is my wife's sister. Me and Charlie went over to Linda's apartment. I got into an argument with Brenda about the money she and Mike owed me. Brenda was supposed to pay me back and with food stamps. Brenda said she didn't get food stamps and couldn't pay me. While we were arguing, Mike came in and told me not to be arguing with his woman. Mike and I argued some about the money and about me arguing with Brenda. Mike fired up on me and I thought he was going to hit me. Mike was a lot bigger than me. I pulled my knife out and hit Mike in the chest. Brenda charged at me and when I turned toward her, she turned to run. I swung at Brenda with my knife. I left Brenda and told someone to call an ambulance. I left with Charlie."
(R. 96-97.)
The appellant testified at trial on his own behalf. He testified that on the morning of the incident, he was returning from his fishing trip when he saw Crittendon. The appellant stated that he asked Crittendon about his money and that Crittendon told him that Brenda Jackson had the money and that Jackson was at his aunt's, Linda Yarbrough Fuqua's, house. The appellant testified that he went to Fuqua's house, where he got into an argument with Jackson. He testified that Jackson kept telling him that she did not have any money. The appellant further testified as follows:
 "When Mike got there he come in. He said, 'Why you in there arguing with my old lady for?' I said, 'I came for my money 'cause you said my money was here.' He said, 'Well, we ain't got it. We just ain't' — 'we ain't going to pay you.' I said, 'Man, dog.' Me and him we got to arguing, got to cussing, fussing. He was sitting across from me and I called him and her, I called him and her a MF and he got a little upset. And he told me, he said, 'Me and Brenda ain't' going to be no MF today.' I said, 'Yes, y'all is.' I said, 'Y'all *Page 540 
going to be another one today.' I said, 'Y'all some sorry MF'ers.' By that time Mike had jumped up. I was sitting in the chair when he charged me and I pushed him. I pushed him back off me, him and Brenda, pushed him back off of me. And when he came back at me, I put my hand in my pocket and got my knife out. I then hit him and hit at her, I run out the door and told Charlie to come on. I got in the car and left and went on back fishing. I was at the river. I was coming up Vine Street and that's when I seen the detective had pulled Charlie Orr over. I asked Charlie what was wrong. He said, 'Well he was looking for you.' I said, 'Well, what's happening?' Then the detective they pulled up and asked me. He said, 'Did you and Michael get into an argument? Have y'all been fighting?' I said, 'Yes, sir.' He said, 'Well what happened?' I said, 'Well, we got to fighting and I hit at him.' He said, 'Well, did you cut him?' I said, 'I don't' know whether I cut him or not.' He said, 'Well you need to go downtown with us.' I said, 'Okay.' I give him my knife, my fishing reel and fish, and I got in the detective's car and went on downtown. And then when we got down there, he came back and told me that, he said, 'Well, you know your stepson's dead?' I said, 'No, sir.' He said, 'Well, you hit him.' I said, 'Well, I said, like I told you, I didn't know whether I hit him or not. I just swung at him to get him off of me and then at Brenda and I ran out the door.' "
(R. 164-65.)
The appellant further testified that after he pushed Crittendon off of him the first time, Crittendon and Brenda Jackson came at him "swinging" (R. 167) and that he opened his knife and "hit at" (R. 169) Crittendon. The appellant stated that there was nowhere to retreat during the fight. He testified that during the altercation, Crittendon appeared to be "high" (R. 165). On cross-examination, the appellant admitted that Crittendon did not have a weapon during the altercation.
The record reflects that the trial court charged the jury on the offense of murder and on the lesser included offense of reckless manslaughter. See §§ 13A-6-2 and 13A-6-3(a)(1), Code of Alabama 1975, respectively. The trial court also charged the jury on self-defense. At the conclusion of the court's oral charge to the jury, the appellant's counsel objected to the trial court's failure to charge on "heat-of-passion" manslaughter. The trial court overruled the appellant's objection, indicating that it did not think that the evidence warranted such a charge and that, further, the appellant was not entitled to a charge on provocation manslaughter because, it said, the appellant had maintained at trial that he had acted in self-defense. On appeal, the appellant contends that the trial court's refusal to charge on "heat-of-passion" manslaughter constitutes reversible error. Under the facts of this case, we agree.
 "A person accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. Chavers v. State, 361 So.2d 1106
(Ala. 1978); Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973); Wiggins v. State, 491 So.2d 1046
(Ala.Cr.App. 1986); Wilkerson v. State, 486 So.2d 509 (Ala.Cr.App. 1986). A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury. Lami v. State, 43 Ala. App. 108, 180 So.2d 279, cert. denied, 278 Ala. 710, 180 So.2d 282 (1965). Every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility. Ex parte Stork, 475 So.2d 623 (Ala. 1985); Chavers v. State, supra; Burns v. State, 229 Ala. 68, 155 So. 561
(1934). Section 13A-1-9(b) provides, 'The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.'
 " 'The "safer" practice is to charge upon all degrees of homicide: "(I)t is much the safer rule to charge upon all degrees *Page 541 
 of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree." Pierson v. State, 99 Ala. 148, 153 13 So. 550 (1892), approved in Williams v. State, 251 Ala. 397, 399, 39 So.2d 37
(1948).'
 "Phelps v. State, 435 So.2d 158, 163
(Ala.Cr.App. 1983)."
Anderson v. State, 507 So.2d 580, 582-583
(Ala.Crim.App. 1987).
The offense of "heat-of-passion" manslaughter is defined in § 13A-6-3(a)(2), Code of Alabama 1975, as follows:
 "(a) A person commits the crime of manslaughter if:
". . . .
 "(2) He causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself."
"[Section] 13A-6-3(a)(2) is designed to cover those situations where the jury does not believe a defendant is guilty of murder but also does not believe the killing was totally justified by self-defense." Shultz v. State, 480 So.2d 73, 76
(Ala.Crim.App. 1985). See also Shiflett v. State, 507 So.2d 1056
(Ala.Crim.App. 1987).
 "To constitute adequate legal provocation, it must be of a nature calculated to influence the passions of the ordinary, reasonable man. Other than discovered adultery, courts have reached different conclusions as to what factual situations are embraced within this doctrine. See Commentary, § 13A-6-3, Code of Alabama 1975. See also Annot., 93 A.L.R.3d 920 (1979)."
Biggs v. State, 441 So.2d 989, 992 (Ala.Crim.App. 1983).
In the case of Cox v. State, 500 So.2d 1296
(Ala.Crim.App. 1986), "the appellant fired the first shot during a fight between his wife, the deceased's ex-wife, and the deceased. The deceased then verbally threatened the appellant and made a movement towards him, whereupon the appellant shot the deceased in the stomach, which resulted in his death." Cox, at 1298 (Ala.Crim.App. 1986). On appeal to this Court, Cox argued that the evidence did not support his conviction for manslaughter because, he argued, the evidence did not show that there was sufficient legal provocation to arouse heat of passion. For this reason, he maintained that his motion for a judgment of acquittal should have been granted. In assessing whether there was sufficient evidence of legal provocation, this Court stated:
 " ' " 'Mere words, no matter how insulting, never reduce a homicide to manslaughter. Manslaughter is the unlawful killing of a human being without malice; that is, the unpremeditated result of passion-heated blood — caused by a sudden, sufficient provocation. And such provocation can, in no case, be less than an assault, either actually committed, or menaced under such pending circumstances as reasonable to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given.' . . ." Reeves v. State, 186 Ala. 14, 65 So. 160, 161.' Easley v. State, 246 Ala. 359, at 362, 20 So.2d 519, 522 (Ala. 1944). Thus, the mere appearance of imminent assault may be sufficient to arouse heat of passion."
Cox, at 1298. (Emphasis added.) In Cox we concluded that "[t]he jury could have reasonably found that the appellant believed that he was about to be assaulted, and, therefore acted out of the heat of passion." Id. (Emphasis added.) See also Gray v.State, 574 So.2d 1010, 1011 (Ala.Crim.App. 1990) (defendant's conviction for manslaughter affirmed because we found that the jury could have reasonably found that the defendant believed that he was about to be assaulted and that he had "acted out of a sudden heat of passion").
The fact that the appellant in this case argued that he had acted in self-defense did not preclude a jury charge on "heat-of-passion" manslaughter. In Hill v. State, 485 So.2d 808
(Ala.Crim.App. 1986), this Court addressed *Page 542 
a situation wherein the defendant's wife died as a result of a blunt-force injury to her head. The defendant maintained at trial that he had acted in self-defense in killing his wife, testifying that he and his wife were arguing when she threatened to kill him and came at him with a knife. The defendant stated that when she did so, he threw a baseball bat at her. On appeal to this Court from his conviction for murder, he maintained that the trial court erroneously failed to charge the jury on manslaughter. We agreed, reasoning:
 "The facts of Wyllie v. State, 445 So.2d 958
(Ala.Crim.App. 1983), cert. denied, 445 So.2d 958
(Ala. 1984) are very similar to those of the case at bar. In addressing the issue now before us, Judge Harris in Wyllie, supra, wrote:
 " 'Appellant's testimony was presented in support of [his] claim of self-defense to prove that [he] was, indeed, justified in killing [his wife]. Implicit in appellant's version of the facts was the theory that [he] was provoked by [his wife's] attack upon [him]. If believed, the appellant's version of the facts might have provided a "rational basis" for a conviction of manslaughter pursuant to § 13A-6-3(a)(2), Code of Alabama 1975. But see, Pennell v. State, [429 So.2d 679 (Ala.Cr.App.)] (evidence did not justify a manslaughter instruction). However incredible appellant's version of the facts might have been, in light of the state's convincing evidence to the contrary, there was evidence of sufficient provocation to reduce the offense from murder to manslaughter. See, Reeves v. State, 186 Ala. 14, 65 So. 160 (1914); Roberson v. State, 217 Ala. 696, 117 So. 412 (1928). Under these circumstances the jury would have been authorized to find the appellant guilty of only manslaughter, as the result of an imperfect claim of self-defense.
 " 'Although the labels have now changed with the restructuring of homicide offenses in Alabama's new Criminal Code, the analyses applied in Reeves and Roberson still apply. The factual circumstances of Roberson, wherein the defendant claimed self-defense and provocation for shooting his victim, are very similar to those of the instant case. The Roberson court emphasized that a "defendant who claims self-defense is not thereby precluded from asserting that the homicide was committed under circumstances reducing it to manslaughter, where the evidence before the jury would so authorize." The weight and credibility of appellant's evidence was a matter exclusively within the province of the jury and a proper manslaughter charge was warranted. Dennis v. State, 112 Ala. 64, 20 So. 925 (1896); Roberson v. State, supra. Although the new code restructuring of homicide offenses has helped somewhat, the difficulty of distinguishing between murder and manslaughter in any given case still exists. Therefore, it is still much the safer rule to charge upon all the degrees of homicide included in the indictment when a party is on trial for murder. Dennis v. State, supra. Reeves v. State, supra; Roberson v. State, supra; Phelps v. State, supra, and cases therein cited.'
"Wyllie, supra at 963."
Hill, 485 So.2d at 809-10.
After reviewing the evidence presented to the jury in this case, we conclude that the trial court erred to reversal in refusing to charge the jury on "heat-of-passion" manslaughter, as set forth in § 13A-6-3(a)(2), Code of Alabama 1975. There was evidence presented, which, if believed by the jury, would support a finding that the appellant believed that Michael Crittendon was about to attack him and that the appellant therefore stabbed Crittendon in a sudden heat of passion. The question of whether legal provocation for heat-of-passion manslaughter was sufficiently proven was a matter to be decided by the jury. Cox, 500 So.2d 1296, 1298. Accordingly, the judgment of conviction is reversed and this cause is remanded to the trial court.
REVERSED AND REMANDED.
All Judges concur. *Page 543